**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Donald TEAGUE, Defendant–Appellant.**

No. 89–8181.

United States Court of Appeals,
Eleventh Circuit.

Aug. 8, 1990.

William A. Morrison, Jones, Morrison & Womack, P.C., Atlanta, Ga., for defendant-appellant.

Gerrilyn Brill, Asst. U.S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before CLARK, Circuit Judge, RONEY *, Senior Circuit Judge, and ATKINS **, Senior District Judge.

CLARK, Circuit Judge:

Defendant Donald Teague appeals the district court's denial of his motion for a new trial. Teague was convicted by a jury of one count of attempt to possess marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and one count of using or carrying a firearm in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c). Teague contends that the district court erred in holding that he was not denied his Sixth Amendment right to, testify in his own behalf at trial and, alternatively, that his counsel was not ineffective for advising him not to testify. Teague also argues on appeal that the district court erred in denying his motion for acquittal, arguing that the evidence presented at trial was insufficient to convict him. We reverse.

---

* See Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

** Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

## BACKGROUND

The evidence presented at trial shows that the criminal charges against Teague arose from the following occurrence. On August 15, 1988, an undercover Drug Enforcement Administration (DEA) agent received a page on his digital beeper from Kenneth Patterson. During several subsequent phone conversations with the agent, Patterson communicated his desire to buy a large quantity of marijuana, and the two men reached an agreement whereby the agent would sell 75 pounds of marijuana to Patterson for $700 per pound. The agent agreed to deliver the 75 pounds in exchange for an initial payment from Patterson of $35,000 and a final payment a few days later of $17,500. The two men eventually agreed to complete the deal on August 17, 1988.

Prior to August 15, 1988, Kenneth Patterson had hired Donald Teague to assist him in completing renovation work on Patterson's mother's home in Atlanta, Georgia. On the morning of August 17, Patterson and Teague made two trips away from the house. On the first trip they went to the hardware store, and then to a bait shop to buy beer. On the second trip they returned to the bait shop to buy ice. Patterson testified that at one of the stops at the bait shop before he got out of the truck he removed a handgun from a brown bag that was sitting in between himself and Teague. He testified that he placed the handgun on the bench seat, and removed some money from the bag. Shortly after their return from the second trip, Patterson called out to Teague to get in the truck with him, and the two men drove off. Patterson testified 'at trial that, either before they got in the truck, before they started out of the driveway, or soon after they left the driveway, Teague asked him where they were going. Patterson testified that he told Teague that he was going to "check out some herbal." The two men then drove to the parking lot of a restaurant, where Patterson had previously arranged to meet with the DEA agent.

Once in the parking lot, Patterson got out of the truck and talked with the agent at the back of the truck. Teague remained seated in the truck during this conversation. The agent asked Patterson who Teague was, and Patterson told him he was his partner. The two men walked back toward the cab of the truck, Patterson got in the driver's seat, and the agent remained outside. The agent then talked to the two men through the driver's side window. The agent testified that he asked Teague if he was Patterson's partner, and that Teague responded affirmatively. The agent testified that he then reviewed the terms of the deal, expressing some concern about Patterson's ability to come up with the additional $17,500 in a few days. The agent testified that Teague told him not to worry, that Patterson was trustworthy. The agent then asked to see the $35,000 Patterson had agreed to bring.

The agent testified that it was not until this point that he saw Patterson remove the handgun from the bag and place it on the seat. The agent then leaned into the cab and flipped through the bundles of money, giving the appearance that he was checking to see that it was all there. The agent then suggested that Patterson accompany him on foot to his car to see the marijuana. The agent also testified that he overheard Patterson and Teague discussing how they would accomplish the transfer of the marijuana from the agent's car to theirs. Patterson got out of the truck, leaving the handgun on the seat, and followed the agent across the parking lot. At this point the agent gave a pre-arranged arrest signal, and Patterson and Teague were arrested.

A federal grand jury returned a three-count indictment against both men for conspiring to possess marijuana with intent to distribute, attempt to possess marijuana with intent to distribute, and aiding and abetting each other in possession of a firearm in connection with a drug trafficking offense. Patterson entered into a plea agreement with the government, but Teague maintained his innocence. The Director of the Federal Defender Program for the Northern District of Georgia was appointed to defend Teague. She met with him three

times prior to trial, in addition to talking with him numerous times by telephone. At the hearing held on Teague's motion for a new trial, she testified that Teague made it known to her from the very beginning that he wanted to tell the jury his side of the story. During their second meeting, she conducted a mock direct and cross-examination with him. She testified that during this practice he became very emotional, blurted out answers before she completed the questions, and cried throughout most of it. Based on this experience, she decided that Teague would not be a good witness. She testified that although she felt the jury would perceive him as "truthful, open, and very sincere," R3–19, she was afraid that he would not listen to the questions, and would let himself get twisted around by the prosecutor under cross-examination.

She also testified that she told him that he had the right to testify, and that she was not ruling it out entirely, but thought they should wait to see how the evidence developed at trial before making a final decision. During this meeting, she did not know whether Patterson would testify for the prosecution or for Teague, and she felt that they should wait to see whether Teague's testimony was necessary before making a final decision as to whether he would testify.

At the trial, it turned out that Patterson elected to testify for Teague and in many respects his testimony was favorable to Teague. Patterson testified that he did not tell Teague about the quantity of "herbal" or the amount of money involved, that Teague was not in on the deal in any way, and that, although Teague did not realize it at the time, he had asked Teague to ride along for his own protection because he had never dealt with the agent before. He testified that when he told the agent that Teague was his partner he was lying because he thought the agent would back out on the deal if he thought that someone was present who wasn't "in on" the deal. According to Patterson, other than stating that Patterson was good for the money, Teague did not say anything to the agent. Patterson also testified that the gun was

his, and that he often rode with it in the truck. R3–77–112.

However, he did state that Teague saw the gun on the seat when they were at the bait shop, well before they arrived at the restaurant parking lot. During the trial, Teague indicated to his attorney in hushed conversations at the defense table that this testimony, and other testimony by the DEA agent, was false and persisted in wanting to know when he would have his turn to tell his side of the story. Nevertheless, after presenting several character witnesses, and the testimony of Patterson, his attorney announced that the defense rested and court recessed for the day. R2–112. The record shows that it was not until they were leaving that day that his attorney again discussed with him his desire to testify. R3–19–21, R2–112. When he explained that the gun had not been taken out of the bag until the agent asked to see the money, she told him that his testimony wasn't important because the agent had already testified to that version of events, and not to worry about it. R2–17–18. The next day closing arguments were made, and the jury retired to deliberate. R2–112–119. The jury acquitted Teague of the conspiracy charge, but found him guilty of attempt to possess marijuana with intent to distribute, and use of a firearm in relation to a drug trafficking offense.

Teague testified at his motion for a new trial that he would have testified at trial that he thought that when Patterson called to him to get into the truck that they were going to the hardware store to get a drill bit he had told Patterson he needed. Additionally, although he knew Patterson smoked marijuana, he did not know what Patterson meant when he said they were going to check out some "herbal". He also would have testified that he merely nodded at the agent when he asked whether Teague was Patterson's partner, and that he did not say anything else to the agent. He would have testified that the agent and Patterson talked "figures", but that he did not know from their conversation that they were talking about marijuana. R3–33–35.

## DISCUSSION

### A. *Sufficiency of the Evidence*

 We turn first to Teague's argument that the evidence presented at trial was insufficient to convict him of either attempt to possess marijuana with intent to distribute, or use of a firearm in relation to a drug trafficking crime. In reviewing the sufficiency of the evidence to support a criminal conviction, we must view the evidence in the light most favorable to the government. *United States v. Brooks*, 703 F.2d 1273, 1277 (11th Cir.1983). The DEA agent testified that Teague participated in his conversation with Patterson, told him he was Patterson's partner, assured him that Patterson was good for the additional $17,500, and agreed with Patterson to help him transfer the marijuana from the agent's car. The large quantity of marijuana and money involved is sufficient circumstantial evidence to prove an intent to distribute. *United States v. Poole*, 878 F.2d 1389, 1392 (11th Cir.1989). A reasonable jury could conclude from this evidence that Teague aided and abetted Patterson in his attempt to possess the marijuana with intent to distribute.

 To support a conviction for violation of 18 U.S.C. § 924(c),[1] the government must prove that the defendant used a firearm and that the use was in relation to a drug trafficking offense. *Poole*, 878 F.2d at 1393. To show use, the government need not show that the firearms were fired, brandished, or even displayed during the offense. *Id.* Proof of possession of a firearm during a drug trafficking offense is sufficient if the possession is "an integral part of, and facilitates the commission of, the drug trafficking offense." *Id.* Viewed in the light most favorable to the government, the evidence shows that Teague was aware of the gun's presence in the truck before they arrived at the restaurant parking lot and that he heard Patterson tell the

agent he specifically brought the gun for protection during this transaction. Furthermore, the gun was out on the seat within the reach of both men throughout the conversation with the agent, and when Patterson left the truck to follow the agent to his car, the gun remained on the seat next to Teague. Under these circumstances, where the evidence shows that the gun was present during the transaction and was openly available for use by both men, the court did not err in submitting to the jury the issue of whether Teague aided and abetted in the use of, or himself used, a firearm in connection with a drug trafficking crime. *See id.* at 1393 (Holding that proof of presence of weapons hidden in the ceiling and under clothes on the floor of the laundry room of a house used to store and distribute large quantities of cocaine is sufficient to convict defendant of violating 18 U.S.C. § 924(c)).

### B. *Teague's Right to Testify*

Teague next contends that even if the evidence was sufficient to convict him, his conviction must be reversed because it was obtained in violation of his Fifth, Sixth, and Fourteenth Amendment rights to testify in his own behalf. Specifically, Teague argues that his attorney knew from the very beginning that he wanted to explain his actions to the jury, that he continued to make his desire to testify known to his attorney during the trial, and that his attorney made the final decision to rest the defense case without allowing him to testify in direct contravention of his desire to testify.

On his motion for a new trial, the district court held that Teague's will to testify was not overborne by his counsel. R1–26–10. The court noted that his attorney testified that at her second meeting with Teague she told him that he had the right to testify, and that it was his decision to make, but that her advice was that he not testify

---

1. 18 U.S.C. § 924(c) provides:
 (1) Whoever, during and in relation to any crime of violence or drug trafficking ... for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for

 such crime ... be sentenced to imprisonment for five years....
 (2) For purposes of this subsection, the term "drug trafficking crime" means any felony punishable under the Controlled Substances Act (21 U.S.C. 801 et seq.)....

because his emotional state would make him vulnerable on cross-examination. The court noted further that Teague made no objection on the record at trial when his attorney rested his case without allowing him to testify.

The court concluded therefore, that the appropriate analysis of Teague's motion was as a motion for a new trial based on ineffective assistance of counsel. The court found that his attorney's reasons for advising Teague not to testify were sound, especially in light of her considerable criminal defense experience and her careful assessment of Teague as a witness through the mock direct and cross-examination. R1–26–11. The court further noted that any error was harmless, as Teague was not prejudiced by his failure to testify. The court found that Teague's testimony that Patterson merely told him he was going to "check out some herbal" and that the gun was not removed from the bag until the agent asked to see the money would have merely duplicated evidence already presented by Patterson and the agent. The court also held that "[p]resumably, Teague would have admitted that he had heard Patterson talk about a drug purchase, and there is no reason to think that he would have denied ... that the specifics of the transaction were discussed in his presence." *Id.* Thus, the court concluded, because Teague's testimony would have been largely duplicative, any error in not allowing him to testify was harmless.

■ Clearly defendant Teague had a constitutional right to testify in his own behalf at his trial. In 1987, the Supreme Court held that "[a]t this point in the development of our adversary system, it cannot be doubted that the defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense." *Rock v. Arkansas*, 483 U.S. 44, 49, 107 S.Ct. 2704, 2708, 97 L.Ed.2d 37 (1987). Because Teague asserts that it was his attorney who abridged this right at his trial, this appeal presents us with an issue that has been left open in this circuit for some years. In *Wright v. Estelle*, 572 F.2d 1071 (5th Cir.), *cert. denied* 439 U.S. 1004, 99 S.Ct. 617, 58 L.Ed.2d 680 (1978), the former Fifth Circuit[2] sitting en banc declined to decide whether a defendant has a fundamental right under the Fifth, Sixth and Fourteenth Amendments to testify in his own behalf which cannot be waived by his attorney under the auspices of "trial strategy". The six judge majority held that, under the facts of that case, even if the defendant had such a right, any error in depriving the defendant of that right had been harmless under *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *Wright v. Estelle*, 572 F.2d at 1072.[3] Until now, no case decided in this circuit since *Wright v. Estelle* has addressed the question of whether an attorney's waiver of a defendant's right to testify against the will of the defendant is a constitutionally effective waiver. For the reasons set forth below, we hold that a defendant's right to testify is fundamental and personal to the defendant, such that it may not be effectively waived by counsel against the defendant's will.[4]

---

2. In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) the Eleventh Circuit adopted as binding precedent all decisions of the Fifth Circuit made prior to the close of business on September 30, 1981.

3. Five judges joined in a concurring opinion which argued that while a defendant enjoys a right to testify at his own trial, the decision of whether he will testify is essentially a matter of trial strategy that is properly allocated to the defendant's attorney. 572 F.2d at 1072–74. Judge Godbold, joined by two other judges, argued strenuously in dissent that a defendant's right to testify is of a fundamental importance similar to that of a defendant's right to proceed

*pro se,* and thus it is a right that can only be waived by the defendant himself, not his attorney. *Id.* at 1074–80.

4. We join with four other circuits that have explicitly held that the defendant's right to testify is fundamental and personal to the defendant, and cannot be waived against his will by his attorney. *United States ex rel Wilcox v. Johnson,* 555 F.2d 115, 118–19 (3d Cir.1977); *Rogers–Bey v. Lane,* 896 F.2d 279, 283 (7th Cir. 1990); *United States v. Bernloehr,* 833 F.2d 749, 751 (8th Cir.1987); *United States v. Martinez,* 883 F.2d 750, 756 (9th Cir.1989). *See also United States v. Butts,* 630 F.Supp. 1145 (D.Me.1986).

This circuit has consistently recognized that many of the tactical decisions made by defense attorneys throughout the course of their representation of the defendant "implicitly involve the waiver of constitutional rights" but do not require the defendant's personal consent. *United States v. Joshi*, 896 F.2d 1303 (11th Cir. 1990). However, "[w]here an inherently personal right of fundamental importance is involved, the defendant's [personal] consent is required." *Id.* at 1307 (citation omitted). Rights that have been found to be inherently personal and of fundamental importance such that only the defendant, not counsel, may waive them include the right to go to trial, *Boykin v. Alabama*, 395 U.S. 238, 242, 89 S.Ct. 1709, 1711, 23 L.Ed.2d 274 (1969), the right to be tried by a jury, *Adams v. United States ex rel. McCann*, 317 U.S. 269, 278, 63 S.Ct. 236, 241, 87 L.Ed. 268 (1942), the right to be represented by counsel, *Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975), and the right to appeal, *Fay v. Noia*, 372 U.S. 391, 439, 83 S.Ct. 822, 849, 9 L.Ed.2d 837 (1963).

Our conclusion that a defendant's right to testify is among these inherently personal rights of fundamental importance that only the defendant may waive is supported by the Supreme Court's decision in *Rock v. Arkansas*, 483 U.S. at 44, 107 S.Ct. at 2704, 97 L.Ed.2d at 37. In *Rock*, the Supreme Court held that a state may not constitutionally enforce a *per se* rule against the admission of hypnotically refreshed testimony by the defendant. The Court reasoned that to the extent that such a rule imposes restrictions on the defendant's right to testify that are arbitrary or disproportionate to legitimate purposes of limiting testimony, it infringes on a defendant's right to testify, which it held has several sources in the Constitution. The right to testify is a "necessary ingredient[ ] of the Fourteenth Amendment's guarantee that no one shall be deprived of liberty without due process of law." *Id.* at 51, 107 S.Ct. at 2709, 97 L.Ed.2d at 37. "It is one of the rights that 'are essential to due process of law in a fair adversary process.' " *Id.* (quoting *Faretta v. California*, 422 U.S. at

819 n. 15, 95 S.Ct. at 2533 n. 15, 45 L.Ed.2d 562). This right is also grounded in the Compulsory Process Clause of the Sixth Amendment, which grants an accused the right to call witnesses whose testimony is material and favorable to his defense. *Id.* at 52, 107 S.Ct. at 2709, 97 L.Ed.2d at 37. Furthermore, the right to testify is "a necessary corollary to the Fifth Amendment's guarantee against compelled testimony." *Id.* at 52, 107 S.Ct. at 2710, 97 L.Ed.2d at 37.

These multiple constitutional sources of the defendant's right to testify alone suggest its fundamental importance in our adversary system. Furthermore, the Court's discussion of the Sixth Amendment as a source for this right gives an important insight into its inherently personal nature. The Court noted that the Sixth Amendment "grants to the accused *personally* the right to make his defense." *Id.* (quoting *Faretta v. California*, 422 U.S. at 819, 95 S.Ct. at 2533, 45 L.Ed.2d at 562). The Court reasoned that "an accused's right to present his own version of events in his own words" is "[e]ven more fundamental to a personal defense than the right of self-representation." *Id.* at 52, 107 S.Ct. at 2709–10, 97 L.Ed.2d at 37.

This comparison of a defendant's right to testify with a defendant's right to represent himself brings to light the qualitative difference between the decision as to whether the defendant should testify and the myriad of other tactical decisions that are made by defense counsel alone. On one level, the question of whether the defendant should testify is a matter of pure trial strategy, requiring judgments on issues such as whether the additional testimony will be helpful, whether the defendant will be able to effectively communicate, and whether the jury will find the defendant credible. Defense attorneys routinely take control of these sorts of decisions for their clients when deciding what witnesses they will call, and absent performance falling below an objective standard of reasonableness that causes prejudice to the defendant, the defendant's conviction will not be reversed even if these

decisions were made against his will. The Court's reliance on *Faretta* in *Rock* indicates, however, that the defendant's right to testify also involves the same values that require that the defendant be allowed to proceed *pro se* if he so chooses. In *Faretta*, the Court recognized that "although [the defendant] may conduct his own defense ultimately to his own detriment, his choice must be honored out of that respect for the individual which is the lifeblood of the law." 422 U.S. at 834, 95 S.Ct. at 2541, 45 L.Ed.2d at 562 (citation omitted). Implicit in *Faretta* is the notion that when society, through its government, brings an individual before the court to face criminal charges, "that respect for the individual which is the lifeblood of the law" requires that the defendant be allowed, if he so desires, to speak directly to his accusers, and the court and jury that will decide his fate.

### C. Was Teague's Right to Testify Violated?

■ Because of the special nature of the relationship between defense counsel and the defendant, a defendant's right to testify, much like the right to effective assistance of counsel, may be abridged by his own attorney, through no fault of the prosecutor or the court. To determine whether Teague's right to testify was violated, we must determine whether the final decision that he would not testify was made against his will. In other words, we must determine whether Teague made a knowing, voluntary and intelligent waiver of his right to testify. *United States v. Martinez*, 883 F.2d at 756 (citing *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). The district court, citing the absence of any objection made by Teague on the record at trial, held that Teague had

failed to prove that he had not acquiesced in the decision to rest the defense without his testimony.[5] We find, however, that the absence of an on the record objection by the defendant himself is of little, if any, probative value in determining whether the decision that the defendant would not testify was the defendant's own decision.

■ In affording a criminal defendant a fundamental right to counsel, the Constitution recognizes that criminal defendants are often unschooled in the intricacies of our criminal justice system, and that without the assistance of counsel, will likely suffer an overwhelming disadvantage in presenting their defense. The defendant relies on his counsel to understand the process of the trial itself and to recognize the proper time for the defendant to be called as a witness. The defendant may not realize until after the jury has retired to deliberate that the proper time for his testimony has passed. Furthermore, once a defendant elects to take advantage of his right to counsel, he is told that all further communications with the court and the prosecutor should be made through his attorney. Aside from any testimony he may give at pre-trial hearings or during trial, a defendant is not permitted to speak directly to the court. In fact, in the interests of decorum and the smooth administration of justice, defendants who speak out of turn at their own trials are quickly reprimanded, and sometimes banned from the courtroom, by the court.[6] It would be anomalous to consider the right to counsel of fundamental importance because of the common lack of understanding of the trial process by defendants, and to require a defendant to rely on his attorney to be his sole spokesperson in the courtroom, while at the same time holding that by failing to speak out at the proper time a defendant has made a

---

5. This reasoning was recently adopted by the Ninth Circuit in *United States v. Martinez*, 883 F.2d 750 (9th Cir.1989) (Holding that defendant's silence at trial may establish waiver of right to testify.) *See also United States v. Edwards*, 897 F.2d 445 (9th Cir.1990) (Post-*Martinez* decision holding that defendant's silence at trial waives defendant's right to testify, despite defendant's contention that he was unaware of his right to testify.)

6. *Foster v. Wainwright*, 686 F.2d 1382 (11th Cir. 1982) (Holding that defendant forfeited his right to be present at trial by interrupting proceedings after warning by judge, even though behavior was neither abusive nor violent), *cert. denied*, 459 U.S. 1213, 103 S.Ct. 1209, 75 L.Ed.2d 449 (1983). *See generally Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970).

knowing, voluntary and intelligent waiver of a personal right of fundamental importance such as the right to testify.

At the hearing on Teague's motion for a new trial, Teague's trial attorney testified that she informed Teague that he had a right to testify, and that it was his decision to make. She also testified that he made her aware from the very beginning that he wanted to testify, and that he continued to ask her about testifying throughout the trial, as witnesses presented testimony he wanted to contradict. She further testified that after Patterson's testimony she decided that Teague's testimony wasn't necessary, and despite her earlier indication that they would discuss the need for his testimony at the trial, she rested the defense case before consulting with Teague one final time. As they were leaving the courtroom and Teague again asked her when he would get to tell his side of the story, she testified that she told him his testimony about the gun wasn't important and not to worry about it. She did not make a motion the next morning to re-open the case to allow him to testify.

None of this evidence was disputed at the hearing. This evidence shows that Teague maintained an unwavering desire to testify throughout the trial, and that he unequivocally communicated this desire to his attorney on more than one occasion. His attorney initially advised him not to testify, but told him that they would make a final decision at the trial. Then, despite his continued indications to her during the trial that he wanted to testify, she rested his case without consulting him. Under these circumstances, we find that Teague's right to testify was violated.

### D. *Prejudice*

In *Wright v. Estelle,* 572 F.2d at 1071, the former Fifth Circuit applied the *Chapman v. California* harmless error standard to a defendant's claim that his conviction should be reversed because his right to testify had been violated. Our review of the record in the present case leads us to conclude that the government has failed to prove beyond a reasonable doubt that the violation of Teague's right to testify did not contribute to his conviction. *Chapman v. California,* 386 U.S. 18, 24–26, 87 S.Ct. 824, 828–29, 17 L.Ed.2d 705 (1967).

In analyzing Teague's motion for a new trial under an ineffective assistance of counsel theory, the district court found that Teague had not been prejudiced when his attorney did not allow him to testify. The court reasoned that because Teague's testimony that Patterson only told him that he was going to "check out some herbal" and that the gun did not appear until the agent asked to see the money had already been presented to the jury through the agent and Patterson, his testimony would have been largely duplicative. The court also found that "presumably" Teague would have admitted that he had heard Patterson talk about a drug deal and would not have denied that the specifics of the deal were discussed in his presence. R1–26–11.

These facts found by the district court, i.e., that Teague's testimony would have "duplicated" testimony already presented regarding certain facts, and that Teague would presumably have admitted that at some point in the agent's conversation with Patterson in the parking lot he figured out that they were talking about a $52,500 marijuana deal, are not sufficient to show that the error in precluding Teague from testifying was harmless. First, even if Teague were to admit that he knew at some point that this was a drug deal, his conviction must rest on evidence that establishes beyond a reasonable doubt that he was more than a knowing spectator to the deal. Secondly, although Teague's testimony regarding certain facts would have been consistent with that of the agent and Patterson, under the circumstances of this case his testimony would have been more than merely duplicative.

Teague's sole defense was that he did not have the requisite intent to commit the crime. He did not deny his presence at the scene, nor did he deny that the agent and Patterson were actually talking about a drug deal. His defense was that he didn't

realize what was happening until it was too late, and that there was nothing for him to do but sit there, and that he had no intention of helping Patterson. In such a case, "[w]here the very point of a trial is to determine whether an individual was involved in criminal activity, the testimony of the individual himself must be considered of prime importance." *United States v. Walker,* 772 F.2d 1172 (5th Cir.1985). This is especially true in the present case, where the evidence regarding Teague's intent was ambiguous at best. The agent testified that he spoke only with Patterson in arranging the deal, and thus could only offer testimony regarding his observations of Teague in the restaurant parking lot. While the agent testified that Teague said things that indicated he was intentionally involving himself in the deal, Patterson testified that Teague didn't know what was going on and had not agreed to help him in any way. No one was in a better position to explain these discrepancies in the evidence about Teague's behavior than Teague himself. We cannot say that, having been given the opportunity to observe that Teague was willing to take the stand, and to judge his candor, his demeanor, and the plausibility of his explanation of his intentions and motivations in being with Patterson on the day in question, a reasonable jury could not have acquitted Teague of either the attempt or weapons charge, or both. The district court's denial of Teague's motion for a new trial must therefore be REVERSED, and this case REMANDED for further proceedings consistent with this opinion.

## CONCLUSION

In recognizing that criminal defendants have a constitutional right to testify that is of a fundamental and personal nature, and that under the circumstances of this case defendant Teague's right to testify was violated, we do not hold that whenever a defendant expresses a desire to testify and does not do so, the defendant's right to testify has been violated. Nothing in our opinion is intended to prohibit defense attorneys from explaining the perils of testifying to their clients and attempting to convince them that despite their desire to take the stand, their best strategy would be to remain silent. We are confident that such discussions take place daily, and that in many instances the defendants come to the conclusion that they should follow their attorney's advice, and personally decide not to exercise their right to testify. We hold only that when, despite any efforts by defense counsel to convince the defendant that the best strategy is to remain silent, the defendant does not personally waive the right to testify and defense counsel fails to allow the defendant to take the stand, the defendant's right to testify has been violated. *Accord United States v. Curtis,* 742 F.2d 1070, 1076 (7th Cir.1984). We emphasize also that the decision as to whether a defendant waived his or her right to testify will depend on the particular circumstances of each case. *See, e.g., Rogers–Bey v. Lane,* 896 F.2d at 283 (Holding that when counsel's advice not to testify was reasonable and defendant personally chose to follow the advice, defendant's right to testify was not violated.); *United States v. Curtis,* 742 F.2d at 1075 (Holding that when defendant persisted in desire to testify, but planned to offer perjured testimony, defendant's right to testify was not violated when attorney failed to allow him to take the stand.).

REVERSED AND REMANDED.

RONEY, Senior Circuit Judge, dissenting:

I respectfully dissent from the decision that this conviction must be reversed because defendant Teague did not testify.

Of course Teague had a right to testify, just as he had a right to call witnesses and present any other relevant evidence. A criminal defendant has numerous constitutional due process rights in the defense of his criminal charge. But counsel is charged with the responsibility of protecting these rights, and making the decision as to whether they should be exercised. The only thing unique about the defendant as a witness is that he does not have to testify.

If the decision as to whether a defendant should testify or put on any other relevant evidence does not fall within the general definition of trial tactics, however, it is hard to see what would be trial tactics. The very reason there has developed the profession of trial attorney is the need for persons trained in trial tactics to represent people who do not have the knowledge to defend themselves.

Trial tactics are the office of the one charged with the representation of the defendant and the presentation of the case. If the defendant represents himself, well and good, he can make these decisions, but if he is represented by an attorney, then the attorney must make the tough decisions concerning trial tactics. The question of whether a defendant should testify can not be appropriately addressed as a single item of evidence. Each piece of evidence affects the other. A defendant's testimony may require a complete adjustment in the tactics of the defense. To turn that decision over to the defendant absolutely in many cases would remove from counsel the entire strategy of the defense.

The record clearly shows that the public defender made a proper, professional, responsible decision in deciding that Teague should not testify. She took his request seriously, tried him out as a witness, and concluded he would hurt, not help his case. There is nothing in this record to reflect that this was not a perfectly sound decision. On the contrary, the evidence supports an objective decision that Teague would indeed hurt his own case by taking the stand.

I would affirm the trial court's denial of a new trial on the reasoning of the specially concurring opinion which I joined in *Wright v. Estelle*, 572 F.2d 1071, 1072–73 (5th Cir.), *cert. denied* 439 U.S. 1004, 99 S.Ct. 617, 58 L.Ed.2d 680 (1978), excerpted as follows:

The real question in this case is not whether the right to testify is a personal or fundamental right; rather, it involves the proper allocation of authority between the attorney and his client. The defendant, of course, has the authority in the first instance to accept or reject court-appointed representation. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). If he decides to accept an attorney, the defendant has necessarily delegated important decision making authority to his attorney. The scope of the delegation does not turn on the importance of the decision—the attorney frequently makes judgments affecting the very life of the defendant. The question here is twofold: who is in a better position to judge trial strategy and who is in a better position to ensure the best interests of the defendant.[3] This court's history is filled with the recognition of the value of an attorney. No one could seriously contend that a defendant is in a better position to dictate trial strategy than his attorney. Moreover, a court-appointed attorney owes a duty to society to see that his client is given the best possible defense within the law. No attorney could discharge this duty if he must yield to the personal demands of his client.

[3] The same cannot be said for the decision to plead guilty or not guilty—a decision that goes to the very existence of a trial. To deny the defendant control over this decision could be tantamount to denying the defendant a trial. Here, of course, there is a trial and the decision made by the attorney goes merely to strategy. The decision to waive a defendant's right to testify is viewed as part of trial tactics in more than a dozen decisions. Comment, *Due Process v. Defense Counsel's Unilateral Waiver of the Defendant's Right to Testify*, 3 Hastings Const. L.Q. 517, 529 (1976).

In my judgment, the district court made the exact inquiry necessary in a case of this kind: was counsel ineffective for having failed to put the defendant on the stand. The record fully supports the decision that she was not. The judicial system has now had enough experience to know that had the lawyer let the defendant testify, the argument on this phase of the litigation would be that counsel who puts on evidence that is known will be prejudicial to a defendant is ineffective. The foreseeable result of this decision is that now numerous convicted defendants will argue that he or she should have been permitted to testify, the right not having been properly

waived by the defendant personally. Assuming the correctness of the decision that the defendant should not testify, retrials will be destined for but one result, the prosecution's evidence being strengthened by the defendant's own testimony, absent intervening circumstances which might make the prosecution more difficult at the new trial. It goes without saying that at the second trial, the defendant could not be compelled to testify, should he suddenly realize that his counsel was indeed correct.

The defendant's *right to decide* whether to testify, whatever its source, is in clear conflict with the constitutional right to be represented by counsel. Having chosen to be represented by counsel, defendant has delegated to counsel his right to run the trial, make tactical decisions, and determine what evidence should be presented to the jury.

This Circuit has just had a Conference of judges and representative lawyers with a single theme addressing the need for professionalism in the conduct of attorneys. As the system struggles with this concept, it is counterproductive to reverse the result of a trial where the trial attorney has conducted herself in an exemplary professional way.

I concur in the other decisions made by the Court in this case, and would affirm the convictions.