# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 06-1916

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DANIEL W. STARK, SR.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 03-CR-30190—**Michael J. Reagan**, *Judge.*

ARGUED MAY 29, 2007—DECIDED OCTOBER 17, 2007

Before BAUER, WOOD, and WILLIAMS, *Circuit Judges.*

WOOD, *Circuit Judge.* Daniel Stark, Sr., was convicted by a jury on a potpourri of charges: being a felon in possession of a firearm (18 U.S.C. § 922(g)); conspiracy to possess and sell stolen motor vehicles (18 U.S.C. § 371); possession of stolen property (18 U.S.C. § 2315); possession and sale of stolen motor vehicles (18 U.S.C. § 2313); conspiracy to engage in monetary transactions in criminally derived property (18 U.S.C. § 1956(h)); and engaging in a monetary transaction in criminally derived property (18 U.S.C. § 1957). On appeal, he challenges the fairness of the trial as a whole on three grounds: he never knowingly and voluntarily waived his right to testify; the

government's closing argument impermissibly referred to his failure to testify; and his attorney was ineffective.

A defendant's right to testify is fundamental, but there is no ironclad rule that a district court judge must always explore the question whether the defendant knowingly and voluntarily waived that right every time a defendant does not testify. There is nothing wrong, however, with a district court's asking a defendant directly if he intends to testify. Indeed, such an inquiry can eliminate doubt on this important point and potentially avert appeals like this one. In this case, however, the district court had no reason to suspect that there was anything wrong with the waiver, and thus the judge acted within his discretion when he did not initiate an inquiry into Stark's decision. Stark's other claims fail as well, and we therefore affirm the judgment of the district court.

## I

Stark was arrested in September 2003 after firearms and stolen tractors were found at his residence during a search authorized by a warrant. Stark's original counsel, Charles Stegmeyer, Jr., urged Stark to enter into plea negotiations after Stark was indicted for one count of being a felon in possession of firearms; Stark followed that advice. During those negotiations, Stark signed a proffer letter that included an admission that he knew that the tractors were stolen. Soon after, the plea negotiations fell apart, and Stark was indicted on the charges we described earlier.

Stark retained a new attorney for trial, Theodore Barylske, Jr., to serve as co-counsel. Stegmeyer later withdrew from the case entirely. At the final pretrial conference, the district court judge stated in open court that he would inquire before the end of the trial whether

Stark would be testifying. Stark was present in court at the time that statement was made.

The government's theory of the case was that Stark knowingly joined a conspiracy to steal tractors and other farm equipment in Illinois and Missouri and resell those vehicles in Kentucky. Stark's attorney attempted to poke holes in the government's case by highlighting the central role that Stark's son, Danny Stark, Jr. ("Danny"), played in the tractor thefts and sales and Stark's alleged lack of involvement in some of these activities. Stark's attorney contended that Stark did not know that the tractors at issue were stolen.

Throughout the trial, both Barylske and Stark informed the district court from time to time that there were problems with their attorney-client relationship. The district court was attentive to these disagreements, which centered primarily around Stark's desire to call additional witnesses. In one exchange among the judge, Stark, and Barylske, the judge told Stark that he was willing to subpoena any necessary witnesses but that he would not allow duplicative witnesses. At no point during this or any other exchange did Stark suggest that he wanted to take the stand.

After he was convicted, Stark made a motion for a new trial. The district court held a hearing, and Stark testified that he had always wanted to take the stand himself but that Barylske had told him that he could not, and Stegmeyer had told him that he was legally forbidden from doing so. Stark acknowledged during his testimony that he had been advised of his rights in 15 earlier criminal judicial proceedings, including a previous federal case in which he was charged with being a felon in possession of a firearm. Barylske testified that Stark had never indicated that he thought he could not testify, that he had discussed with Stark the disadvantages of testifying

and asked Stark for his thoughts, and that Stark said he did not want to testify because he did not want to call his son Danny a thief. Barylske concluded that Stark did not want to testify in his own behalf. This, Barylske thought, was the better way of proceeding, and that was what the two agreed. The district court credited Barylske's testimony and denied the motion for new trial.

## II

### A

We consider first whether the district court committed reversible error by refusing to order a new trial. Stark and the government appear to disagree about the standard of review that applies to this issue. The government argues that an abuse of discretion standard applies to the district court's credibility determination with respect to the defendant's belief that he had no right to testify. Stark states that this issue should be reviewed *de novo*. See *United States v. Webber*, 208 F.3d 545, 550 (6th Cir. 2000) (employing *de novo* review of a defendant's argument that he was denied his right to testify). In several prior decisions, we have discussed the issue of waiver of the right to testify in terms of "reversible error" without resolving the standard of review question. *United States v. Campione*, 942 F.2d 429, 438 (7th Cir. 1991); *United States v. Brimberry*, 961 F.2d 1286, 1289 (7th Cir. 1992); see also *United States v. Manjarrez*, 258 F.3d 618, 625 (7th Cir. 2001); *United States v. Benitez*, 92 F.3d 528, 536 n.6 (7th Cir. 1996).

We review *de novo* the question whether an evidentiary ruling infringed upon a defendant's constitutional right to testify. *United States v. Carter*, 410 F.3d 942, 951 (7th Cir. 2005); see also *United States v. Bajakajian*, 524 U.S. 321, 337 n.10 (1998) (holding that "the question whether

a fine is constitutionally excessive calls for the application of a constitutional standard to the facts of a particular case, and in this context *de novo* review of that question is appropriate," citing *Ornelas v. United States*, 517 U.S. 690, 697 (1996)); *United States v. Frederick*, 182 F.3d 496, 499 (7th Cir. 1999) (distinguishing constitutional issues, where *de novo* review of a mixed question is often appropriate, from others). We have also held that "[t]he issue of waiver [of one's right to testify] is a question of fact." *Galowski v. Murphy*, 891 F.2d 629, 635 (7th Cir. 1989). These holdings are consistent with our analysis in a comparable context—whether a defendant waived his *Miranda* rights, which we review *de novo*. *United States v. Smith*, 218 F.3d 777, 780 (7th Cir. 2000). Any findings of fact or credibility determinations, however, are reviewed for clear error. *United States v. Walker*, 272 F.3d 407, 412 (7th Cir. 2001).

We take this occasion to clarify what we believe is implicit in our earlier rulings. Where the district court has made a specific ruling on the underlying facts relating to a waiver, we review those findings for clear error, as in *Galowski* and *Walker*. The determination of whether, in the final analysis, the defendant's constitutional right to testify was infringed, is a mixed question of law and fact that we review *de novo*. The standard established in *Chapman v. California*, 386 U.S. 18 (1967), applies to a denial of the right to testify. *Alicea v. Gagnon*, 675 F.2d 913, 925 (7th Cir. 1982). Therefore, if there was no valid waiver, then the government must show that the error was harmless beyond a reasonable doubt. *Chapman*, 386 U.S. at 24.

B

Turning to the merits of the waiver issue, we consider first Stark's claim that he believed he was unable to

testify, and the district court's conclusion that, even if Stark held such a belief, he did not signal it to the court in any way. "[W]e have repeatedly held that the Constitution does not require a trial court to question a defendant *sua sponte* in order to ensure that his decision not to testify was undertaken knowingly and intelligently unless there is some indication that the defendant has been prevented from exercising that right." *Manjarrez*, 258 F.3d at 623. We have been concerned about the risk of "discourag[ing] district court judges from directly questioning a defendant concerning his decision not to testify for fear that in so doing judges will insert themselves into a sensitive aspect of trial strategy, thereby intruding inappropriately on the attorney-client relationship." *Id.* at 624. This is not to say, however, that judges should never question a defendant directly about whether he understands his right to testify and whether he is voluntarily waiving that right. To the contrary, if defense counsel informs the judge that the defendant does not intend to testify, the judge may ask the defendant whether he generally understands that he is entitled to take the stand. Depending on his answer, the judge may also ask follow-up questions to determine whether the defendant had discussed his decision not to testify with his lawyer and to ensure that the final decision represented the defendant's personal choice. In the end, however, the court usually retains discretion either to engage in this kind of colloquy or not. Before such an inquiry is required, there must be something more than general speculation. Criminal defendants and their lawyers often do not see eye to eye. If a district court were compelled to inquire into every potential conflict it thought it had spotted, there would be a risk of multiple, unnecessary proceedings, some of which might even imperil the attorney-client relationship. More is needed before this kind of judicial duty arises.

One such indication that a defendant is not voluntarily waiving his right to testify is when the judge becomes aware that there is "a conflict between the defendant and his lawyer on the matter" of whether the defendant should testify. *Id.* at 624. Other circuits have also drawn this line. The Sixth Circuit has employed a similar limitation, upholding the defendant's waiver where "[t]here is no evidence in the record that Defendant attempted to communicate with and 'alert the trial court' to a disagreement with defense counsel *regarding whether Defendant should take the stand.*" *Webber*, 208 F.3d at 552 (emphasis added); see also *United States v. Sys. Architects, Inc.*, 757 F.2d 373, 375-76 (1st Cir. 1985) (holding there is "no constitutional or statutory mandate that a trial court inquire further into a defendant's decision to not testify under the facts here" where "the record [does not] contain anything which would alert the court to a disagreement between attorney and client regarding whether they should take the stand"); *United States v. Pennycooke*, 65 F.3d 9, 11 (3d Cir. 1995) ("We therefore hold that usually a court need not advise a defendant either directly or through a colloquy with counsel of his or her right to testify."); *United States v. McMeans*, 927 F.2d 162, 163 (4th Cir. 1991) (adopting the Ninth Circuit's standard in *Martinez*, discussed below, and holding that "[t]o waive the right, all the defendant needs to know is that a right to testify exists"); *United States v. Bernloehr*, 833 F.2d 749, 751-52 (8th Cir. 1987) (holding that defendant waived right to testify by silence at trial on the issue); *United States v. Martinez*, 883 F.2d 750, 760 (9th Cir. 1989), vacated on other grounds, 928 F.2d 1470 (9th Cir. 1991) (same); *United States v. Janoe*, 720 F.2d 1156, 1161 (10th Cir. 1983) (same).

A few circuits have expressed concerns about requiring a defendant to speak up about her right to testify at trial when all other expressions on her behalf are made

by her attorney. See *United States v. Ortiz*, 82 F.3d 1066, 1071 (D.C. Cir. 1996) (noting "the impracticability of placing a burden on the defendant to assert a right of which he might not be aware or to do so in contravention of the court's instructions that the defendant speak to the court through counsel" and holding that indications of ineffective assistance of counsel might require court inquiry about the defendant's decision not to testify); *United States v. Teague*, 908 F.2d 752, 759-60 (11th Cir. 1990) (discussing the logical error in "requir[ing] a defendant to rely on his attorney to be the sole spokesperson in the courtroom, while at the same time holding that by failing to speak out at the proper time a defendant has made a knowing, voluntary and intelligent waiver of a personal right of fundamental importance such as the right to testify"), rev'd on other grounds, 953 F.2d 1525 (11th Cir. 1992) (*en banc*) (concluding that "the appropriate vehicle for claims that the defendant's right to testify was violated by defense counsel is a claim of ineffective assistance of counsel"). The Second Circuit has held that "absent something in the record suggesting a knowing waiver, silence alone cannot support an inference of such a waiver," but that court still concluded that waiver can be found in such a case where the "[t]rial counsel's detailed description of events was eminently credible." *Chang v. United States*, 250 F.3d 79, 82, 86 (2d Cir. 2001).

In the present case, Stark argues that "[t]he evidence establishes that Mr. Stark did not acquiesce in any strategic decision regarding whether he should testify." The record belies such a conclusion. In a pre-trial hearing, at which Stark was present, the court specifically referred to Stark's right to testify and asked the defense attorney to inform the court at a later date whether or not Stark would testify. This shows, at a minimum, that Stark was aware that he had the right to testify.

Although there is no doubt that there were disputes between Stark and his attorney, there were no indications that these disputes related to his decision whether to testify. Nor were there any indications that Stark's attorney might not properly advise his client about that right or that Stark might be incapable of fully considering his attorney's advice. At each point in the trial that Stark cites as an indication of attorney-client conflict, the district court allowed Stark to express his concerns openly. For example, when Stark gave the judge a letter through his lawyer, the judge accepted it from the lawyer (who handed the sealed letter to the judge unread) and promised to address it after the next break. The judge held two closed sessions with Stark and his attorney, during which Stark complained at length and in detail about not being able to find and prepare some of the additional witnesses he wanted and not having enough time to review all the documents the government had produced. The district court did not cut him short. For example, Stark told the district court:

> I am just unhappy about the way I was represented. I am really unhappy about it. I spent two years trying to get my story out, two years, and this is the second lawyer, and I thought we had an agreement that we would subpoena whatever witnesses and we would find whatever witnesses. I thought we was going to get investigators. . . .

Stark also told the court:

> I don't know, to me it is like a snowball going downhill. It is kind of out of control and I don't know what to do. I don't know what the Court's powers is. I know for sure that if I don't have time to go through the Gateway records . . . [I can't] show that I really didn't spend this money and that was really important records to me, and I have asked Ted [defense attorney] since I hired him [to get the records].

None of these complaints even hinted that Stark believed that he could not testify. The court had no indication that the defendant's desire to testify was at issue, and without such an indication, it was not required to inquire. *Manjarrez*, 258 F.3d at 623. (Moreover, Stark's lengthy explanations of his frustrations without any reference to his alleged belief he was not allowed to testify more likely suggests that this was not one of Stark's concerns.) Perhaps if the court had refused to hear Stark's specific complaints but knew that Stark was complaining generally about how to present his case, it would have erred in not inquiring about Stark's decision whether to testify. But that is not what happened here.

There are only a few cases in which this court has held that a defendant did not properly waive the right to testify. These decisions are interesting only for the way in which they contrast with Stark's case. In *Ward v. Sternes*, this court held that a defendant had not waived his right to testify where the defendant had "brain injuries [that] severely disrupted his ability to think, reason, take in verbal information, and understand and use language to express his understanding" and who responded "I guess, I don't know" to the court's question as to whether he agreed with his lawyer's advice not to testify. 334 F.3d 696, 705-06 (7th Cir. 2003). In *Ortega v. O'Leary*, the defendant told the court during the trial that he wanted to testify. 843 F.2d 258, 261 (7th Cir. 1988). There is no definitive list that we could create that would describe when a district court must explore a defendant's decision not to testify. We can say only that a finding that a waiver was not made knowingly and voluntarily must be based on something concrete, such as a clear indication that the defendant disagreed with her lawyer about testifying or direct evidence that the defendant had not made a valid waiver, such as the evidence of the defendant's diminished competency in *Ward*. Presumably, if

the defendant told the court outright that he wanted to testify but his lawyer was standing in the way, the court would correct any misunderstandings immediately.

Even using the less restrictive standard from the Second Circuit's decision in *Chang*, or the D.C. Circuit's analysis in *Ortiz*, we still would not accept Stark's argument on this issue. The *Ortiz* court added an additional consideration that would require court inquiry—evidence of ineffective assistance of counsel—but it did not endorse a general inquiry rule. 82 F.3d at 1071. *Chang* held that although silence is not enough to show waiver, a defense attorney's post-trial credible testimony sufficed to show waiver in the absence of contradicting evidence other than the defendant's general statements. 250 F.3d at 86.

In the post-trial hearing on the motion for a new trial in this case, Stark's trial attorney testified that Stark's proffer included an admission that the tractors at issue were stolen. If Stark had testified, that statement would have been admissible, and highly prejudicial. The attorney explained in detail why he had advised Stark not to testify, noting both the admission and Stark's prior criminal history, which included some of the identical crimes. The attorney also testified that Stark told him he did not want to take the stand because "[t]he thought of going up on the stand and saying [his] son was a thief, he just said he wouldn't do it." The district court found the attorney's testimony to be more credible than Stark's, concluding "to the extent I have to choose between Mr. Stark's version and Mr. Barylske [the attorney], I would choose Mr. Barylske. He was more persuasive. His rationale made more sense." Thus, even if silence were not enough in this case, the credibility finding in the post-trial hearing, which Stark has given us no reason to disturb, defeats Stark's claim on appeal.

## III

Stark's second argument for reversal rests on his claim that the prosecutor impermissibly commented on his failure to testify in the closing argument. He is correct that the prosecution cannot make certain "[i]ndirect references to the defendant's failure to testify," *Burke v. Greer*, 756 F.2d 1295, 1300 (7th Cir. 1985), but here Stark attempts to extend this principle beyond its reach. Prosecutors are allowed to comment on the weakness of the defendant's case in closing arguments. *United States v. Snook*, 366 F.3d 439, 445 (7th Cir. 2004). Indirect comments that could refer to the defendant's failure to testify may violate the Fifth Amendment, but "only if (1) the prosecutor manifestly intended to refer to the defendant's silence or (2) a jury would naturally and necessarily take the remark for a comment on the defendant's silence." *United States v. Mietus*, 237 F.3d 866, 871 (7th Cir. 2001).

We analyze the indirect comment at issue "in context." *Id.* at 872; see *United States v. Robinson*, 485 U.S. 25, 33 (1988). For example, in *Mietus*, we concluded that

> [t]he thrust of the prosecutor's argument was that the defense team's 'words' were not consistent with the evidence of the defendants' actions. The statements did not draw the jury's attention to anything Mietus himself did or did not say; rather, they referred to the 'words' of Szarflarski [another defendant] and of the defendants' counsel. To the extent that the statements referred to Szarflarski's testimony, they can be seen as simple commentary on the evidence. The statements were not manifestly intended to suggest that Mietus's silence was evidence of his guilt, nor would a jury naturally and necessarily take them that way.

237 F.3d at 872.

Stark relies on a First Circuit case to argue that a government's statement that a defendant is "hiding" at

trial is necessarily a reference to the defendant's choice not to testify. In *United States v. Hardy*, 37 F.3d 753, 757 (1st Cir. 1994), the First Circuit held that the prosecution's closing argument statement that the defendants are "still running and hiding today" was an impermissible reference because it made an inappropriate analogy between the running and hiding the defendants allegedly did on the night of the crime and their lack of testimony at trial. But there was more to *Hardy* than this one analogy. At trial, the prosecutor repeatedly had referred to the defendants' "hiding," even though this comment could not be understood as a response to any of the defendants' specific evidence or theories of the case. Instead, it made sense only as a comparison of the defendants' trial behavior with the fact that the defendants were found by the police actually hiding just moments after the crime. 37 F.3d at 756.

In the present case, the prosecution used the word "hiding" in its closing arguments as well. Because there was no objection to this statement when it was made, we review it for plain error. See *United States v. DeGeratto*, 876 F.2d 576, 585 (7th Cir. 1989) ("Unless defense counsel's original continuing objection to the . . . inquiry carries over to the closing argument, we must review the reference . . . in closing argument under the plain error standard."). To show plain error, Stark must show "(1) there [wa]s indeed an error, (2) it [wa]s plain, clear or obvious, and (3) it affect[ed his] substantial rights." *United States v. Walker*, 447 F.3d 999, 1005 (7th Cir. 2006). If the answers to all three of those questions are affirmative, then we still must consider whether the interests of the judicial system more broadly require correction of the error. *Id.* We consider first whether the inclusion of the prosecution's statements was error at all.

Looking at the prosecution's statements in context, we conclude that they were not allusions to Stark's decision

not to testify. Rather, the word "hiding" was a direct response to the theory of the defense on which Stark had relied throughout the trial. The most potentially troublesome line in the prosecution's closing argument was "[t]hroughout this trial [Mr. Stark] was hidden behind his son." But as in *Mietus* and *Hardy*, this statement must be assessed in context. Stark's attorney contended throughout trial that Stark had no knowledge that the tractors on his property were stolen, but that only Danny knew the illegitimate origin of the tractors. Thus, Stark's defense relied on the contention that Danny, rather than Stark himself, was to blame. Characterizing this defense as Stark "'hid[ing]' behind his son" is accurate. It does not show a manifest intent to refer to Stark's silence, nor would a jury naturally and necessarily take the remark in that light. As in *Mietus*, the prosecution's closing argument simply pointed out "that the defense team's [theory of the case was] not consistent with the evidence of the defendants' actions." 237 F.3d at 872.

During the trial, the prosecution presented evidence that Stark had Danny perform the more overt actions of the criminal operation—stealing the tractors, making the deliveries of the stolen tractors—but that Stark remained in charge. Given such facts, it seems likely that the prosecutor's statements would have been the same if Stark had testified. The same could not be said about the prosecution's statement in *Hardy*. Therefore, Stark's argument fails at the first stage of the plain error analysis because he has not shown that his rights were violated.

**IV**

The last issue is whether Stark was denied effective assistance of counsel. This claim is governed by the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984). Stark "must show both that his attor-

ney's performance was outside the range of professionally competent assistance and that the deficient performance denied him a fair trial." *United States v. Banks*, 405 F.3d 559, 569 (7th Cir. 2005). Reversal is appropriate only "when it has been shown with a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* We note that Stark has opted to include this issue in his direct appeal, even though it is normally preferable to wait until a motion under 28 U.S.C. § 2255, so that a complete record can be developed.

Stark argues that his attorney was ineffective for three reasons: he failed to secure an on-the-record colloquy about Stark's decision not to testify; he failed to object to the prosecution's closing argument; and he too referred to Stark's failure to testify in his closing argument. The attorney testified about Stark's decision not to testify. According to this testimony, which the district court credited, Stark himself agreed that he would not testify. The lack of an on-the-record colloquy is therefore unimportant. In addition, the district court found that this decision reflected a reasonable trial strategy. On appeal, Stark has given us no reason to conclude otherwise. The failure to object to the prosecution's closing argument is also not a proper grounds for this claim because the prosecution's statement was not improper, as discussed above.

The only remaining issue is whether the defense counsel's own closing argument could be viewed as such an impermissible reference to Stark's failure to testify that it rendered the lawyer's assistance to Stark constitutionally ineffective. In his closing argument, Stark's attorney said:

> My client, Danny Stark [Sr.] over here, has not said, and I want to get this straight, has not said in the

course of this trial or at any other point in his life, one bad word about his son. He has not hired me to hide behind his son. He hired me . . . to prove his innocence. . . .

In the course of that, we, of course, came across several investigations and the inevitable truth. The inevitable truth is that [Stark's] son was involved in the theft of tractors. It doesn't matter that [Stark] won't say it. It doesn't matter that he can't say it. What matters is I am his defense attorney and it was my choice to pursue a defense which showed the truth of what happened. That was my choice. That's what I pursued. I take exception to the Government's attempt to belittle my client, to belittle his relationship with his son.

For his claim to succeed, Stark must "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotations omitted). We have no trouble finding that these statements were part of a responsible trial strategy. Although Stark's choice not to testify may have been called to the jury's mind, this was not inevitable. More likely, the jury understood defense counsel to be trying to persuade it to shift the responsibility for the criminal activities away from Stark so that he would appear more sympathetic to the jury. This was a reasonable choice, and likely Stark's best strategy at closing arguments given the evidence implicating Danny and him together. After all, Danny delivered stolen tractors to Stark's property in the middle of the night. In addition, one of the co-conspirators, William Mourey, testified about a night of stealing tractors with Danny and Stark's girlfriend's 15-year-old son. He testified that the three of them drove the three stolen tractors in the middle of the night to Stark's property

while Stark drove back and forth past the threesome while they made their way to his place.

On the record as it stands, Stark has not overcome the presumption that his attorney's actions were part of a reasonable trial strategy, let alone that his attorney's performance was outside the range of professionally competent assistance and denied him a fair trial. We thus reject the argument that Stark's lawyer rendered ineffective assistance.

## V

At the trial, Stark faced compelling evidence against him. We are satisfied based on this record that Stark's attorney mounted a reasonable and appropriate defense, and that the district court committed no reversible error. We therefore AFFIRM Stark's conviction.

A true Copy:

       Teste:

 

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*