In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3569

United States of America,

Plaintiff-Appellee,

v.

Acencion Manjarrez, also known as Phil,
also known as Felipe,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 CR 614--Ruben Castillo, Judge.

Argued April 2, 2001--Decided July 18, 2001


   Before Bauer, Cudahy, and Easterbrook,
Circuit Judges.

   Bauer, Circuit Judge.  Manjarrez appeals
his conviction for conspiracy and
possession with intent to distribute mar
ijuana, arguing that he did not knowingly
and intelligently waive his right to
testify on his own behalf, and that
certain jury instructions and an argument
made by the prosecutor during closing
argument prejudiced his case and deprived
him of a fair trial. We affirm.

BACKGROUND

   On October 18, 1996, Jose Suarez asked
Gustavo Marquez to pick up a 196-pound
shipment of marijuana for Efren Terrazas.
The shipment was en route from Laredo,
Texas to the Yellow Freight warehouse in
Chicago Ridge, Illinois. Marquez agreed
to pick up the marijuana. The next day,
Manjarrez rented a Ryder truck that
Marquez drove to the Yellow Freight
warehouse; Manjarrez and two passengers,
Terrazas and a man named Joe, followed
Marquez to the warehouse in Manjarrez's
car, a blue Chevrolet Caprice.
   When he arrived at the warehouse,
Marquez discovered that the marijuana
shipment had not yet arrived.
(Unbeknownst to him, it had been
intercepted by federal agents in Texas
and was in the process of being sent from

Texas to United States Customs personnel in Chicago.) Marquez left the warehouse and drove the truck to the Ryder rental facility, where he was met by Terrazas and Manjarrez. Manjarrez returned the truck.

On October 21, 1996, Suarez called Marquez and told him that the shipment had arrived at Yellow Freight. Marquez, Terrazas, and Joe then returned to the same Ryder rental facility and waited for Manjarrez, who eventually arrived and rented another truck. In the parking lot, Manjarrez handed Terrazas the keys to the truck, together with money to pay for the shipping costs. Terrazas handed these items to Marquez. While all four men were standing in the parking lot, Terrazas explained to Marquez that "they" (i.e., Terrazas, Manjarrez, and Joe) would be in the defendant's car watching to make sure that the truck was not being followed. Manjarrez was at Terrazas' side when he made this statement.

That afternoon, Marquez drove the truck to the warehouse. Customs agents had established surveillance at the warehouse, and they observed Marquez arrive and drive off with the marijuana-filled crate in the Ryder truck. From there, Marquez drove toward the planned delivery site at 147th and Loomis in Chicago, with Customs agents on his tail. Following Terrazas' instructions, Marquez took a long and circuitous route to the delivery site. Early on in the journey, the pursuing agents noticed Manjarrez's blue Caprice following the truck at every turn and performing counter-surveillance maneuvers--that is, maneuvers designed to detect the presence of pursuing law enforcement officers. After some 90 minutes of driving, the truck and Manjarrez's car approached the 147th Street exit off of Interstate 57 in Chicago. However, sensing that they were being followed by law enforcement officers, Manjarrez and his passengers decided to separate from the truck, and Manjarrez drove in the opposite direction on 147th Street.

Marquez eventually drove the truck to his own neighborhood in Chicago. Fearing apprehension, Terrazas abandoned the drug deal. However, the next day, Suarez, Marquez, and another man, Luis Moreno, devised an alternate plan to deliver the

marijuana. As part of this plan, Marquez and Moreno transported the marijuana to Moreno's garage, where they were arrested shortly thereafter.

Manjarrez was interviewed by Customs agents on January 28, 1997. He admitted renting a Ryder truck on October 21, 1996, but denied renting one on any other occasion. With respect to the October 19th rental, Manjarrez claimed that he rented the truck for a friend named Jose Rodriguez who needed the truck to move from his home, that he provided Rodriguez the keys to the truck and returned home immediately, and after later attempting to determine whether Rodriguez had returned the truck, he eventually reported the truck missing to the Chicago Police Department.

In August of 1998, Manjarrez was indicted and charged with conspiracy to possess with intent to distribute marijuana in violation of 21 U.S.C. sec.sec. 846 and 841(a)(1) (Count One), and with possession of marijuana with intent to distribute in violation of 21 U.S.C. sec. 841(a)(1) and 18 U.S.C. sec. 2. (Count Two). He remained a fugitive until he was arrested by Customs agents at O'Hare airport in Chicago on February 17, 2000. After waiving his Miranda rights, Manjarrez spoke with the agents, again admitting that he had rented a Ryder truck on October 21, 1996. He again claimed that he had rented the truck for Jose Rodriguez, and he gave an account that was consistent with the story that he gave during his first interview, with one notable exception; this time, Manjarrez said that he was told by a member of the Ryder rental facility that the truck had been used to transport drugs. However, Manjarrez denied knowing Terrazas, Marquez, or Suarez, and persisted in his denial even after being shown pictures of all three men.

At trial, several witnesses testified for the government, including the Customs agent who discovered the marijuana-filled crate in Texas, two Chicago Customs agents who oversaw the investigation at different times (both of whom interviewed Manjarrez and one of whom participated in the October 21, 1996 surveillance), a narcotics expert with the Drug Enforcement Administration, and Marquez./1 The jury heard evidence of

the conflicting statements that Manjarrez gave to law enforcement agents regarding his rental of Ryder trucks. The defense presented no evidence.

During the jury deliberations, the jury sent the district court notes requesting clarification on two separate occasions. In the first note, the jury asked the court whether they could return a not-guilty verdict on the possession charge even if they returned a guilty verdict on the conspiracy charge. After conferring with and receiving the blessing of counsel for both sides, the court instructed the jury to read the jury instructions and to keep deliberating. In the second note, the jury asked the court to provide guidance regarding the definition of reasonable doubt. After again conferring with both attorneys, the court informed the jury that it could not provide further guidance on the definition and asked them to continue their deliberations.

On May 10, 2000, the jury convicted Manjarrez on both counts. On September 20, 2000, the district court sentenced Manjarrez to 51 months in prison followed by three years of supervised release. Manjarrez appeals his conviction.


DISCUSSION

Manjarrez advances three grounds for the reversal of his conviction. He claims (1) that he did not knowingly and intelligently waive his right to testify in his own behalf, (2) that the district court erred in giving an "ostrich" jury instruction without also expressly instructing the jury that subjective good faith on Manjarrez's part was a defense to the charges, and (3) that the prosecutor made an improper and prejudicial remark during closing argument. Manjarrez argues that these errors (together or singly) deprived him of a fair trial, and quite likely prejudiced the outcome of the trial given what he characterizes as the "thinness" of the government's case and the confusion expressed by the jury during their deliberations. We address Manjarrez's arguments in turn.


A. Manjarrez's waiver of his right to

testify

Manjarrez contends that the record establishes that he did not knowingly and intelligently waive his right to testify on his own behalf. Near the close of the government's case-in-chief, the district court asked Manjarrez's counsel whether he intended to rest immediately after the close of the government's case (without putting on any evidence). He responded in the affirmative. The court then asked Manjarrez's counsel if he would like the court "to talk to Mr. Manjarrez right now about not testifying." Manjarrez's counsel responded that he would, and the court engaged in the following colloquy with Manjarrez:

COURT:  Mr. Manjarrez, the Court understands that it's your decision in this case not to testify in your own defense. As you've heard me tell the jury several times, you have an absolute right not to testify, and I would be happy to continue to instruct the jury as I have already that they cannot draw any inference or suggestion of guilt from the fact that you did not testify.

On the other hand, you should know that you have an absolute right to testify in your own defense. Do youunderstand?

MANJARREZ:  (Through Interpreter)/2 Yes.

COURT:  You understand that you can testify in your own defense if you decide you want to.

MANJARREZ:  (Through Interpreter) Well, yes.

COURT:  Okay. I also want you to know that being realistic about this, even though sometimes I instruct the jury not to draw any inference or suggestion of guilt from the fact that you didn't testify, it could be that some jurors are going to draw that type of inference. Do you understand that?

MANJARREZ:  (Through Interpreter) Yes, that's fine.

COURT:  Knowing all of this, is it your desire not to testify in this case?

MANJARREZ:  (Through Interpreter) No. I mean my lawyer's here to answer

everything that needs to be answered.

COURT:  Okay. Has anyone forced you in any way or threatened you in order to get you not to testify?

MANJARREZ:  (Through Interpreter) No.

COURT:  Okay. And let me just tell you, Mr. Manjarrez, you're free to continue to talk to Mr. Halprin [defense counsel], and if you decide at any point that you want to testify, that's strictly up to you. Do you understand that?

MANJARREZ:  (Through Interpreter) That's fine.

COURT:  Okay. I'll leave it at that.

Trans. at 223-24.

  Manjarrez asserts that nowhere in the above dialogue is there evidence that he knowingly and intelligently waived his right to testify. While the court did ask a series of basic questions regarding Manjarrez's intentions not to testify and elicited a series of "yes" responses from him through the interpreter, Manjarrez contends that this was insufficient since the court "did nothing to satisfy itself that [Manjarrez], who did not speak or understand fluent English, understood the substance of what it means to testify." In addition, he notes that at no time during the colloquy did his counsel state on the record that he had explained to him what it means to testify. Finally, Manjarrez seizes on his response to the court's fourth question, wherein he stated that his lawyer was "here to answer everything that needs to be answered," and argues that it demonstrates a "total lack of understanding of what it means to testify," since it seems to imply that he thought that his lawyer could testify and offer evidence on his behalf as a witness. According to Manjarrez, all of this indicates that he waived his fundamental constitutional right to take the stand without adequately comprehending either the nature of his right or the consequences of waiving it. Manjarrez maintains that this deprived him of a fair trial and, in light of what he considers to be the weakness of the government's case as well as the jury's confusion during their deliberations,

that it probably affected the outcome of the trial. On these grounds Manjarrez urges us to reverse his conviction or to remand for an evidentiary hearing on the issue of whether his waiver of his right to testify was knowing and intelligent. We reject both Manjarrez's arguments and his request.

A criminal defendant has a constitutional right to testify on his own behalf. See Rock v. Arkansas, 483 U.S. 44, 49-53 (1987); Morgan v. Krenke, 232 F.3d 562, 569 (7th Cir. 2000). This right is "an aspect of the [criminal defendant's] right to defend himself," Underwood v. Clark, 939 F.2d 473, 475 (7th Cir. 1991), which arises from the Sixth Amendment's guarantee of compulsory process to obtain favorable witnesses, see Stephens v. Miller, 13 F.3d 998, 1002 (7th Cir. 1994) (en banc), as well as the Fifth Amendment's due process clause./3 It is also a "necessary corollary" of the Fifth Amendment's guarantee against compelled testimonial self-incrimination. See id. (citations omitted). The right to take the stand on one's own behalf is personal to the defendant, which means it can only be waived by the defendant himself, and not by his counsel. See Jones v. Barnes, 463 U.S. 745, 751 (1983) ("the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to . . . testify in his or her own behalf . . ."); United States v. Curtis, 742 F.2d 1070, 1076 (7th Cir. 1984). Moreover, because the defendant's right to testify is a fundamental constitutional right "essential to due process of law in a fair adversary process," Rock, 483 U.S. at 51 (quotation omitted), the defendant's waiver of the right must be knowing and intelligent. See United States v. Pennycooke, 65 F.3d 9, 11 (3d Cir. 1995) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 241 (1973)); United States v. Teague, 953 F.2d 1525, 1533 (11th Cir. 1992) (ruling that "there can be no effective waiver of a fundamental constitutional right unless there is an 'intentional relinquishment or abandonment of a known right or privilege' Johnson v. Zerbst, 304 U.S. 458, 464 . . . (1938)"); see also United States v. Webber, 208 F.3d 545, 550 (6th Cir. 2000). However, we have repeatedly held that the Constitution does not require a trial court to question a

defendant sua sponte in order to ensure that his decision not to testify was undertaken knowingly and intelligently unless there is some indication that the defendant has been prevented from exercising that right. See, e.g., Liegakos v. Cooke, 106 F.3d 1381, 1386 (7th Cir. 1997) (rejecting defendant's argument that a judge must inquire on the record whether the defendant understands the advantages of testifying and must elicit a former waiver of the right to testify); United States v. Thompson, 944 F.2d 1331, 1345 (7th Cir. 1991) (ruling that "courts have no affirmative duty to determine whether a defendant's silence is the result of a knowing and voluntary decision not to testify" (citations omitted), and that a court is not constitutionally required to make such an inquiry "absent some indication that the defendant has been prevented from exercising [his] right [to testify]"). Indeed, we have discouraged district court judges from directly questioning a defendant concerning his decision not to testify for fear that in so doing judges will insert themselves into a sensitive aspect of trial strategy, thereby intruding inappropriately on the attorney-client relationship. See Liegakos, 106 F.3d at 1386; United States v. Campione, 942 F.2d 429, 439 (7th Cir. 1991); Underwood, 939 F.2d at 476. For this reason, we have suggested that courts refrain from questioning a defendant regarding his decision not to take the stand unless there is some indication that either the defendant actually wants to testify and is being prevented from doing so or that there is a conflict between the defendant and his lawyer on the matter. See Thompson, 944 F.2d at 1345; see generally Ortega v. O'Leary, 843 F.2d 258, 260-61 (7th Cir. 1988).

There is nothing in the record which required the district court to do anything more than it did to insure that Manjarrez's waiver of his right to testify was knowing and intelligent. Manjarrez does not claim that he expressed a desire to testify which his counsel refused to honor. See Campione, 942 F.2d at 439. Nor does he argue that his counsel failed either to inform him of his right to testify or adequately to explain the right and the consequences of waiving it. Indeed, Manjarrez has not

even submitted an affidavit stating that he did not understand any of these things at the time of the waiver. Further, the case for finding a knowing and intelligent waiver of the right to testify is stronger here than in several other cases wherein we have found such a waiver. The district court posed a series of clear and straightforward questions through an interpreter, informing Manjarrez of his right to testify and of the consequences of waiving it, and repeatedly asked Manjarrez if he understood what the court was saying and whether he wished to waive his right. Manjarrez repeatedly indicated that he did understand and that he did wish to waive his right to testify. This is not a case wherein we have to infer a defendant's waiver from his mere silence (i.e., from his mere failure to take the stand and to object when his counsel rested without calling him as a witness). Rather, we have unambiguous affirmative indications of waiver from Manjarrez's own lips.

Nevertheless, Manjarrez claims that his response to the fourth question in the colloquy shows that he was laboring under a fundamental misapprehension regarding what it means to testify, and that once the trial court was put on notice of this it was obligated to take further steps to insure that he fully and correctly understood the right that he was waiving. We are not persuaded. After informing Manjarrez of his absolute right to testify and of the possibility that jurors might draw an adverse inference from his failure to testify, the court asked Manjarrez, "knowing all this, is it your desire not to testify in this case?" Manjarrez responded, "No. I mean my lawyer's here to answer everything that needs to be answered." He never expressed confusion regarding the meaning of his right to testify nor asked the court for clarification, despite having been asked several times whether he understood. Moreover, his response does not clearly demonstrate a lack of understanding regarding the meaning or significance of his right to testify. Manjarrez said merely that his lawyer would "answer everything that needs to be answered." He did not say that his lawyer would "testify" on his behalf. Given this, his response can reasonably be taken to mean that Manjarrez thought that his lawyer

would do everything that needed to be done by way of presenting a defense (i.e., that his lawyer would make any arguments on Manjarrez's behalf that needed to be made, without the aid of Manjarrez's testimony), and not that he thought that his lawyer would testify for him.

Thus, we do not hesitate to hold Manjarrez bound by his waiver. While there may be cases wherein a defendant's conduct clearly indicates a fundamental lack of understanding regarding the meaning of the right to testify and/or the consequences of waiving it, this is not such a case. We will not vacate Manjarrez's conviction or require further proceedings on the basis of an unsubstantiated, post hoc claim that he did not understand his right to testify when he waived it, cf. Underwood, 939 F.2d at 476, especially when the claim is belied by the record.

## B.  Ostrich instruction

Manjarrez claims that the district court erred in giving this court's pattern "ostrich" jury instruction without also expressly instructing the jury that it may consider evidence of Manjarrez's subjective good faith as a defense. The court gave the following instruction, based on Fed. Crim. Jury Instructions of the Seventh Circuit sec. 4.06 (1998), over Manjarrez's objection:

When the word "knowingly" is used in these instructions, it means that the defendant realized what he was doing and was aware of the nature of his conduct and did not act through ignorance, mistake, or accident. Knowledge may be proved by the defendant's conduct and by all the facts and circumstances surrounding the case.

You may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut his eyes for fear of what he would learn, you may conclude that he acted knowingly as I have used that word. You may not conclude that the defendant had knowledge if he was merely negligent in not discovering the truth.

We have approved the giving of this instruction "in cases in which there is evidence that the defendant, knowingly or strongly suspecting that he is involved in shady dealings, takes steps to make sure that he does not acquire full or exact knowledge of the nature and extent of those dealings." United States v. Wallace, 212 F.3d 1000, 1004 (7th Cir. 2000) (citation and internal quotation omitted). We have ruled that the instruction is appropriate "when a defendant claims a lack of guilty knowledge and there are facts and evidence that support an inference of deliberate ignorance." Id. (citation and internal quotation omitted). Manjarrez does not argue that it was improper for the court to give the ostrich instruction in his case as a general matter. Rather, he asserts that the ostrich instruction should be given only together with instructions that the jury may consider evidence of the defendant's subjective good faith as a defense, and he maintains that the district court's failure to include such a good faith defense instruction in the jury charge unfairly induced the jury to convict him despite "extremely weak" evidence of his culpable mental state. Manjarrez contends that it is highly likely that he would have been acquitted on one or both counts absent the error, especially given what he characterizes as the thinness of the government's case against him (which he claims consisted primarily of the testimony of a co-defendant who had received a sentencing benefit in exchange for his testimony), and the jury's confusion regarding the law (as illustrated by the notes they sent to the trial court during their deliberations).

Manjarrez's arguments are unavailing. First, his counsel never tendered a "good faith" instruction to the district court. As we have noted, "we require a formal submission of a proposed charge, otherwise we will consider alleged defects in the court's instructions only under the plain error doctrine." See United States v. Holland, 831 F.2d 717, 723 (7th Cir. 1987) (citation and quotation omitted)./4 In addi-tion, under the circumstances presented here, we find that the district court committed no error, much less plain error, in giving the ostrich instruction without an

accompanying good faith instruction. A defendant is not entitled to a specific good faith instruction so long as, "considering the instructions as a whole, the jury was adequately instructed upon his theory of defense." See United States v. Given, 164 F.3d 389, 394 (7th Cir. 1999) (citation omitted). When the jury instructions actually given "as a whole treat a case fairly and accurately," a defendant is not prejudiced by a district court's failure to give a particular instruction, and under such circumstances we will not disturb the jury instructions on appeal. See United States v. Koster, 163 F.3d 1008, 1011 (7th Cir. 1998) (citation omitted). Put another way, it is unnecessary to give a particular defense instruction if its essential points are covered in another instruction. See Holland, 831 F.2d at 723; see also Koster, 163 F.3d at 1011 ("We defer to the substantial discretion of the district court for the specific wording of the instructions, and in rejecting a proposed instruction, so long as the essential points are covered by the instructions given.") (citation and quotation omitted). Considering as a whole the jury charge given in this case, it is clear that the district court accu rately and amply instructed the jury regarding the mental state which needed to be proven in order to sustain a conviction on both counts charged. For example, in addition to the ostrich instruction, the district court issued the following instruction, which was a modified version of the theory-of-defense instruction proposed by the defendant:

The gist of the offense of conspiracy is the agreement among the conspirators to commit an offense. Those without knowledge of the conspiracy are not conspirators. One who, without more, furnishes supplies or services to one engaged in a criminal activity is not guilty of conspiracy even though his sale of goods or services may have furthered the object of a conspiracy so long as the seller of the goods or services has no knowledge of the conspiracy.

Moreover, while the court declined to issue various instructions proposed by the defense (each of which presented a variation of the "mere presence" defense to the charge of conspiracy), the court ultimately gave this Circuit's pattern

"mere presence" instruction, which reads:

A defendant's presence at the scene of a crime and knowledge that a crime is being committed is not alone sufficient to establish the defendant's guilt. A defendant's association with conspirators is not by itself sufficient to prove his participation or membership in a conspiracy.

See Fed. Crim. Jury Instructions of the Seventh Circuit sec. 5.11(a) (1999).

Finally, the district court provided the jury with careful and accurate definitions of the crimes charged, informing the jurors that they could not find Manjarrez guilty of either charge unless they found that the government proved his guilt beyond a reasonable doubt as to each element of each offense, including Manjarrez's knowledge or intent with respect to the charged offenses. Specifically, the court instructed the jury that:

In order to establish the offense of conspiracy as charged in Count 1, the government must prove:

First, that the conspiracy charged in count 1 existed; And, second, that the defendant knowingly became a member of the conspiracy with an intention to further the conspiracy. . . . If . . . you find from your consideration of all the evidence that any of these propositions has not been proved beyond a reasonable doubt, than you should find the defendant not guilty. . . .

To be a member of the conspiracy, . . . the government must prove beyond a reasonable doubt that the defendant was aware of the common purpose and was a willing participant. . . .

Trans. at 317-19.

In order to establish the offense of possession with intent to distribute marijuana as charged in count 2, the government must prove the following propositions: First, that the defendant knowingly or intentionally possessed marijuana. Second, that the defendant possessed marijuana with the intent to deliver it to another person. It does not matter whether the defendant knew the

substance was marijuana. It is sufficient that the defendant knew that it was some kind of prohibited drug.

. . . If . . . you find from your consideration of all the evidence that any of these propositions has not been proved beyond a reasonable doubt, then you should find the defendant not guilty.

Trans. at 320-21.

Taken together, these careful and straightforward explanations of the degree of knowledge and intent that the government must prove to convict Manjarrez on each charge, coupled with the repeated admonitions not to convict unless such a degree of guilty intent is established beyond a reasonable doubt, make it highly unlikely that the jury found Manjarrez guilty of either charge without also finding beyond a reasonable doubt that he had the required mental state. See Koster, 163 F.3d at 1012 (upholding the lower court's denial of defendant's good faith defense instructions where instructions on the knowledge element of the charges "encompassed any good faith defense"); United States v. Smith, 995 F.2d 662, 675 (7th Cir. 1993). In addition, the ostrich instruction itself made it clear that a defendant does not act "knowingly" when he acts through "ignorance, mistake, or accident," or where "he was merely negligent in not discovering the truth." This alone might well obviate any need for a separate good faith instruction. See Given, 164 F.3d at 394-95. Finally, the theory-of-defense instruction and the "mere presence" instruction given by the district court contain the substance of the good faith instruction that the defendant now claims should have been proposed by his trial counsel and issued by the court. Each instruction conveys the proposition that if Manjarrez did not know about the conspiracy to commit the charged offense, or did not know that he was assisting a drug deal, that he was not guilty. Therefore, "even without a separate instruction . . . [t]he jury was given a sufficient opportunity to consider whether [the defendant] acted in good faith," because the defendant's "theory of defense was already part of the district court's charge." Koster, 163 F.3d at 1012; see also Given, 164 F.3d at 394-95 (holding that the district court

did not err by refusing to give a good faith instruction where the instructions as a whole "made it abundantly clear to the jury that if [the defendant] acted in good faith, he was not guilty of mail fraud."); United States v. Paiz, 905 F.2d 1014, 1023 (7th Cir. 1990) (abrogated on other grounds by Gozlon-Peretz v. United States, 498 U.S. 395 (1991)) (holding that while the issuance of an ostrich instruction was improper as to one of the conspiracy defendants, it was nevertheless harmless error where its effect was "neutralized" by the court's issuance of "mere presence" and "willing participation" instructions, both of which "tend[ed] to negate any chance that the jury would convict [the defendant] on any finding other than that he knowingly joined and participated in the conspiracy") (citation omitted); United States v. Grizaffi, 471 F.2d 69, 75 (7th Cir. 1972). Therefore, the district court's failure to give a good faith instruction sua sponte was not plain error. Indeed, considering the other instructions given as a whole, even if Manjarrez's counsel had tendered a good-faith jury instruction the court would have been justified in refusing it, and we would affirm such a decision.


   C.  Prosecutor's remarks during closing argument

   Manjarrez's final claim of error can be dismissed with dispatch. Manjarrez argues that the government improperly suggested to the jury that a defendant could be found guilty of conspiracy under an aiding-and-abetting theory of liability. He notes, correctly, that the district court had earlier rejected the government's proposed instruction which specifically addressed aiding-and-abetting liability in the context of a conspiracy charge, and instead subsequently issued an aiding and abetting instruction which was not expressly tied to either the conspiracy charge (Count One) or to the substantive offense (Count Two). Manjarrez maintains that given the weakness of the government's case and the subsequent juror confusion, the Assistant United States Attorney (AUSA)'s "improper argument" was prejudicial and likely induced the jury to convict in derogation of the trial court's instructions and in

violation of Manjarrez's due process right to a fair trial./5

We disagree. As we recently noted,

[i]n reviewing allegations of improper comments by a prosecutor, we employ a two-step process. We first look at the comments in isolation to determine if they were improper. . . . If we find the comments are proper, the analysis ends. If we find they are improper, we must then examine the comments in light of the record as a whole to determine whether the comments deprived the defendant of a fair trial.

United States v. Castillo, 148 F.3d 770, 775 (7th Cir. 1998) (citations omitted). A close reading of the allegedly improper remark and of the context in which it occurred reveals that the AUSA made the remark in an attempt to demonstrate Manjarrez's guilt of the possession charge, not the conspiracy charge. The AUSA stated:

I believe Judge Castillo is going to instruct you . . . that [the defendant is] guilty if he's aiding and abetting someone else's possession of the marijuana. That is, Mr. Manjarrez is renting the truck or driving the counter-surveillance, or both, so that he could help someone else possess this marijuana and move it . . . and he does that knowingly, then he is guilty of that charge. (emphasis supplied).

The plain language of the statement refers exclusively to the possession charge, and the AUSA made the statement while discussing the facts and evidence pertinent to that charge, after he had finished discussing the conspiracy charge. The district court ultimately gave a generic aiding-and-abetting instruction, and Manjarrez does not argue (nor can he) that the jury could not find him guilty of the possession charge if they determined that he aided and abetted the commission of that offense. Therefore, the AUSA's comment was entirely consistent both with the instructions given by the district court and with the law. Hence, we find that the remark was perfectly proper. It caused Manjarrez no prejudice, and it certainly did not deprive him of a fair trial.

CONCLUSION

We have considered Manjarrez's other arguments, and find them meritless. For the foregoing reasons, we AFFIRM Manjarrez's conviction.

FOOTNOTES

/1 Marquez was separately charged with conspiring to possess with intent to distribute marijuana in connection with the same transaction. He pled guilty to the charge, and received a sentencing benefit in exchange for agreeing to testify against Manjarrez.

/2 Manjarrez, a native Spanish speaker, required the assistance of an interpreter at trial. Two foreign language interpreters were sworn in at the trial's outset, and throughout the course of the trial they translated the words spoken at trial into Spanish, as well as the words spoken by Manjarrez into English.

/3 Rock held that the right of the accused to testify on his own behalf in a state trial arises, in part, from the due process clause of the Fourteenth Amendment. Rock, 483 U.S. at 51. However, a defendant's right to testify on his own behalf in a federal criminal proceeding like the one at issue here stems from the due process clause of the Fifth Amendment, which is applicable to the federal government.

/4 In a single "throw-away" sentence and without any supporting argument or citation to pertinent authority, Manjarrez also claims that his trial counsel rendered ineffective assistance of counsel by failing to ask the district court to issue a good faith defense instruction once he learned that the court was planning to issue the ostrich instruction. As we have recently stated, "we are generally reluctant to hear ineffective assistance of counsel claims on direct appeal because most trial records, unsupplemented by a 28 U.S.C. sec. 2255 hearing, lack the evidence necessary to fashion a successful claim." United States v. Pergler, 233 F.3d 1005, 1009 (7th Cir. 2000) (citation omitted). In addition, Manjarrez's ineffective assistance argument is presented in a cursory manner which makes us even less inclined to address it. We find the argument waived because it is insufficiently developed. See United States v. Wimberley, 60 F.3d 281, 287 (7th Cir. 1995) ("perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived . . .") (citation omitted).

/5 Manjarrez also suggests without developed argu-

ment or citation to authority that his trial counsel rendered ineffective assistance by failing to move for a mistrial in response to the AUSA's improper comments. This argument meets the same fate as Manjarrez's other ineffective assistance claim; it is waived.