**James E. WARD, Petitioner,**

v.

**Jerry L. STERNES, Warden, Respondent.**

**No. 00–2145.**

United States District Court, C.D. Illinois, Urbana Division.

June 27, 2002.

Daniel D. Yuhas, Martin J. Ryan, Office of State Appellate Defender, Springfield, IL, for Petitioner.

Russell K. Benton, Office of Illinois Attorney General, Chicago, IL, for Respondent.

## ORDER

McCUSKEY, District Judge.

On June 23, 2000, Petitioner, James E. Ward, filed a Petition under 28 U.S.C. § 2254 for a writ of habeas corpus (# 6). On August 7, 2000, Respondent, Jerry L. Sternes, filed an Answer (# 9) to the Petition. On August 28, 2000, Petitioner filed a Reply to Answer (# 11). Following a careful review of Ward's Petition for a Writ of Habeas Corpus and supporting documents, Respondent's Answer and exhibits, and Ward's Reply to Answer, Ward's petition (# 6) is GRANTED.

## FACTS

*Procedural Background*

On September 29, 1994, James E. Ward was charged with the first-degree murder of his wife, whom he stabbed at least twenty times. On April 4, 1995, he was declared unfit to stand trial. His fitness was deemed restored at a hearing on February 21, 1996. His symptoms were judged to be controlled by psychotropic drugs, but the fitness report cautioned that "one must exercise patience and listen closely to what [Ward] is saying as a result of his severe handicaps from an earlier brain injury." Trial began August 19, 1996. At trial, Ward did not deny killing his wife but claimed he was not guilty by reason of insanity.

On August 22, 1996, the jury found Ward guilty but mentally ill (GBMI). His post-trial motion on the validity of the waiver of his right to testify was denied, and Ward was sentenced to 40 years' imprisonment. Ward was represented by private counsel at trial and through the posttrial proceedings. At all times since the filing of his appeal on July 31, 1998, he has been represented by Martin J. Ryan, Assistant Defender, and Daniel D. Yuhas, Deputy Defender, Office of the State Appellate Defender, Fourth Judicial District.

On appeal, Ward argued that (1) the jury's rejection of the insanity defense was against the manifest weight of the evidence; (2) he did not knowingly and voluntarily waive his right to testify; (3) the statute permitting a GBMI verdict (725 Ill. Comp. Stat. 5/115–4(j) (West 1996)) violated his constitutional rights to due process and equal protection; and (4) the trial court erred by giving the jury a non-pattern jury instruction on voluntary intoxication. The Appellate Court, Fourth District, rejected all the challenges and affirmed Ward's conviction. *People v. Ward,* 297 Ill.App.3d 1140, 250 Ill.Dec. 95,

737 N.E.2d 717 (1998) (unpublished order) (Ill.App.Ct. July 31, 1998). On August 25, 1998, the Appellate Court denied Ward's petition for rehearing. Ward's petition for leave to appeal to the Illinois Supreme Court was denied on June 2, 1999, and his petition for a Writ of Certiorari to the United States Supreme Court was denied on October 12, 1999. Having exhausted the remedies available through the State, he petitioned for a Writ of Habeas Corpus on June 23, 2000, seeking relief solely on grounds that he did not make a valid waiver of his fundamental constitutional right to testify on his own behalf.

*Trial Testimony*

The only disputed issue at trial was Ward's sanity. Due to a traumatic injury nine months prior to the commission of the crime, Ward had "very marked" abnormalities of the left frontal and temporal lobes of his brain. *Ward,* slip op. at 6–7. Neurologists testified that the temporal lobe controls language, and the frontal lobe governs inhibition. *Ward,* slip op. at 8. Uncontroverted evidence at trial showed that brain injuries severely impeded Ward's ability to process language and to control his impulses. On September 9, 1994, the day of the killing, Ward may have sustained further brain damage when he was hit in the head with a chair and a brass object. Habeas pet. at 2. He showed no ability to recall events of September 9, 1994, beyond that point. Habeas pet. at 18–19. He also was intoxicated that day, with a blood alcohol level of .234. *Ward,* slip op. at 3.

One characteristic of Ward's language-processing deficit was a disconnect between questions asked of him and answers he would give. For example, at his hospital admission for the head trauma in 1993, Ward replied "Yes" to both "Are you black?" and "Are you white?" Habeas pet. at 3. In an examination by a neuropsychologist prior to his trial in 1996, Ward responded "No" both when asked if a boat would sink in water and if a stone would sink in water. With "Yes" and "No" answers, he indicated that a hammer was good for cutting wood and for pounding nails; that two pounds of flour weighed more than and less than one pound of flour; and that good rubber boots kept water out and let water in. Habeas pet. at 4–5.

The two psychiatrists testifying on behalf of Ward at the trial both expressed the opinion that Ward was legally insane when he killed his wife. Dr. Arthur Traugott considered it likely that Ward might have been unable to control his violent impulse toward his wife even if he had been sober. *Ward,* slip op. at 9. He indicated that due to the brain injury Ward probably could not control his use of alcohol and drugs. *Ward,* slip op. at 9. Dr. Lawrence Jeckel, on cross-examination, agreed with the State's suggestion that alcohol was a "necessary component" of Ward's lack of capacity to control his actions. *Ward,* slip op. at 10. The psychiatrists' testimony was not rebutted by expert testimony offered by the State, nor was it substantially impeached on cross-examination. *Ward,* slip op. at 11.

On August 21, 1996, the defense concluded its case without putting Ward on the stand. *Ward,* slip op. at 14. The prosecutor raised the issue of whether Ward or his attorney had made the decision that Ward would not testify. Defense counsel responded that counsel had made the decision and that "my discussions with him get answered 'uh-huh.' So, he'll say 'uh-huh.'" *Ward,* slip op. at 14–15. Counsel nonetheless agreed to discuss the matter with Ward. The next morning, in chambers, the court asked Ward whether his attorney had talked with him about it, and Ward responded, "Yeah." The court asked whether Ward agreed with the decision,

and Ward replied with a *non sequitur* about his future. The court said, "We are really not here to discuss that. We just want to make sure that you're in agreement that it is a good decision that you not testify." Ward responded, "I guess. I don't know." *Ward,* slip op. at 15. After excusing Ward, the court said, "That's the best we will ever do." *Ward,* slip op. at 16.

The jury rejected Ward's insanity defense and found Ward guilty but mentally ill. The Appellate Court concluded that the question of Ward's sanity was "closely balanced," but that "the evidence presented raised a question of fact that the jury was entitled to resolve against the defendant." *Ward,* slip op. at 13. The court cited the alcohol factor as distinguishing Ward's case from *People v. Janecek,* 185 Ill.App.3d 89, 133 Ill.Dec. 273, 540 N.E.2d 1139, 1143 (1989), where it rejected a jury's finding that a defendant was sane as against the manifest weight of the evidence. *Ward,* slip op. at 13.

Immediately after trial, Ward asked his counsel why he had not had a chance to tell his story. Habeas pet. at 6. His attorney then filed a post-trial motion alleging that Ward had not validly waived his right to testify, because he had not understood counsel's advice. Habeas pet. at 6. At the hearing on his post-trial motion on September 23, 1996, Ward was asked whether he remembered the discussion with the judge about testifying. He replied, "No, I didn't know. I just said yes. That's all I know. I didn't know what I can remember, what they saying, so just said yes." Asked whether he knew "what it means to testify," he replied, "I don't know. I'm trying to find something to tell me what I know it is, but I couldn't understand what it is." He then was asked, "Did you want to tell your story?" and replied, "Yes." *Ward,* slip op. at 16–17. The Appellate Court describes the hearing transcript as

then containing "four pages of rambling, incoherent narrative about the night of the killing," cut short by the judge. *Ward,* slip op. at 17.

The trial court denied the post-trial motion, the judge stating that he found at the time that Ward understood what his attorney was talking about, and that "in his own way he concurred in that." *Ward,* slip op. at 18.

The Appellate Court found no consensus as to the correct standard of review to apply when a defendant claims his right to testify has been abridged. It turned for guidance to decisions regarding the waiver of *Miranda* rights, citing Illinois Supreme Court authority for the proposition that the question of whether a valid *Miranda* waiver has been made is a question of fact to be determined by the totality of the circumstances, including the characteristics of the defendant. *Ward,* slip op. at 20. The Appellate Court concluded that "the determination of whether a waiver of a defendant's right to testify was knowingly and intelligently made is a question of fact that can be reversed only if it is contrary to the manifest weight of the evidence." *Ward,* slip op. at 20.

The court called the right a fundamental one that can be waived only by the defendant, but concluded that Ward was informed of his right. Citing precedent where implied waivers of the right to testify were deemed valid, the court concluded that "surely an express statement by a defendant that he accepts his attorney's advice must support an express waiver." The court concluded that Ward validly waived his right to testify. *Ward,* slip op. at 22.

## ANALYSIS

In his Petition (# 6) and Reply to Answer (# 11), Ward argues that he is entitled to relief because: (1) the right to

testify in one's defense is a fundamental constitutional right, and Ward's waiver of that right was not knowing and intelligent and therefore was not valid; (2) the Appellate Court improperly used a deferential standard in reviewing the trial court's ruling that the waiver was valid, contrary to and unreasonably applying United States Supreme Court precedent that calls for use of the *de novo* standard in reviewing the waiver of fundamental rights; and (3) the error in accepting the waiver was not harmless because Ward's testimony would have been likely to demonstrate his impaired mental faculties to the jury and could have shown that he had no memory of stabbing his wife.

## I. APPLICATION OF 28 U.S.C. § 2254(d)(1)

Respondent argues that Ward's petition must fail because 28 U.S.C. § 2254(d)(1) requires Supreme Court precedent that is on point both factually and as a matter of law before a federal court may grant habeas. Ward has cited Supreme Court authority requiring knowing and intelligent waiver of fundamental rights generally, and of specific other fundamental rights, such as the right to counsel, the right to plead not guilty, and the right to trial by jury. However, he cites no Supreme Court precedent for the specific proposition that waivers of the fundamental right to testify in self-defense must be knowing and intelligent. Respondent considers this fatal, arguing that under § 2254(d)(1) this court must be limited to determining whether the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States." According to Respondent, an "unreasonable application" is limited to "grave" errors.

In interpreting § 2254(d)(1), the Supreme Court has made clear that federal courts owe deference to state courts' decisions on collateral review, unless those decisions are "unreasonable." *Williams v. Taylor*, 529 U.S. 362, 407–08, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Speaking for the Court, Justice O'Connor stated that "[a] state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case certainly would qualify as a decision 'involv[ing] an unreasonable application of ... clearly established Federal law.'" *Williams*, 529 U.S. at 407–08, 120 S.Ct. 1495.

 In the case at bar, the clearly established federal law is that fundamental constitutional rights require a knowing and intelligent waiver; the facts to which this law must be applied pertain to Ward's waiver of his right to testify. The mere fact that waiver of this particular right has not been litigated before the U.S. Supreme Court does not warrant the conclusion that no prisoner may benefit from habeas for violation of this right. Pointing to the difficulty of distinguishing state-court decisions "involving an unreasonable extension of a legal principle from a decision involving an unreasonable application of law to facts," the Court found it "sufficient to hold that when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case, a federal court applying § 2254(d)(1) may conclude that the state court decision falls within that provision's 'unreasonable application' clause." *Williams*, 529 U.S. at 408–409, 120 S.Ct. 1495.

The Seventh Circuit has pointed out that there is no abstract answer to the question of when a departure is so great as to be "unreasonable," and has counseled that application of § 2254(d)(1) will require "careful inquiry one case at a time," taking into account "the care with which the state court considered the subject." *Lindh v.*

*Murphy,* 96 F.3d 856, 871 (7th Cir.1996), *rev'd on other grounds,* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Respondent also urges that habeas relief is unavailable in this case because Ward's claim rests on a "new rule." Answer at 8. However, Ward bases his claim on clearly established federal law as determined by the Supreme Court. Therefore, Respondent's reliance on *Teague*'s prohibition of "new rules" is misplaced. *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

Thus, this court is not barred from granting habeas relief for the denial of the right to testify in one's own behalf, if the state courts unreasonably applied Supreme Court precedent controlling the waiver of fundamental constitutional rights.

## II. RIGHT TO TESTIFY

Ward argues vigorously that the right to testify on one's own behalf is a fundamental constitutional right. In *Rock v. Arkansas,* 483 U.S. 44, 51–53, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987), the Supreme Court affirmed its longstanding assumption of the fundamental nature of the right of the criminally accused to testify in self-defense, finding its sources in several constitutional provisions. The right to testify is "one of the rights that 'are essential to due process of law in a fair adversary process,'" guaranteed by the Fifth and Fourteenth Amendments. *Rock,* 483 U.S. at 51, 107 S.Ct. 2704, *citing Faretta v. California,* 422 U.S. 806, 819, n. 15, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). A defendant's opportunity to defend himself by calling witnesses, guaranteed by the Sixth Amendment, is incomplete if he may not testify; "[e]ven more fundamental to a personal defense than the right of self-representation ... is an accused's right to present his own version of events in his own words." *Rock,* 483 U.S. at 51, 107 S.Ct. 2704. The right to testify also is "a necessary corollary" to the Fifth Amendment guarantee against compelled testimony. *Rock,* 483 U.S. at 51, 107 S.Ct. 2704. Citing *Rock,* the Seventh Circuit agreed that the right to testify is a fundamental constitutional right. *Rogers–Bey v. Lane,* 896 F.2d 279, 283 (7th Cir.1990), *cert. denied, Rogers–Bey v. McGinnis,* 498 U.S. 831, 111 S.Ct. 93, 112 L.Ed.2d 65 (1990) ("[t]he right to testify truthfully on one's own behalf is a fundamental right grounded in the due process clause of the fifth amendment and the compulsory process clause of the sixth amendment"); *United States v. Manjarrez,* 258 F.3d 618, 623 (7th Cir.2001) ("[a] criminal defendant has a constitutional right to testify on his own behalf").

■ The right to testify is one of a handful of personal rights that the Supreme Court has identified as being personal to the accused, and thus not susceptible to being waived by counsel on the defendant's behalf. *Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983); *Manjarrez,* 258 F.3d at 623. Thus Ward's waiver of the right to testify was valid only if he personally waived the right.

Because the defendant's right to testify is a fundamental constitutional right essential to due process in a fair adversary proceeding (*Rock,* 483 U.S. at 51, 107 S.Ct. 2704), the defendant's waiver must be knowing and intelligent. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 237, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) ("[T]he requirement of a knowing and intelligent waiver has been applied ... to those rights which the Constitution guarantees to a criminal defendant in order to preserve a fair trial."); *Manjarrez,* 258 F.3d at 623 ("defendant's waiver of the right [to testify] must be knowing and intelligent") *see also Boykin v. Alabama,* 395 U.S. 238, 243, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969); *Johnson v. Zerbst,* 304 U.S. 458, 464, 58

S.Ct. 1019, 82 L.Ed. 1461 (1938). Thus, this court concludes that, based upon United States Supreme Court precedent, Ward's personal waiver must have been knowing and intelligent to be valid.

## III. PROPER STANDARD OF REVIEW

Ward argues that the sufficiency of a waiver of a fundamental right is a legal question requiring plenary review, and that the Appellate Court thus erred in requiring that the trial court's ruling on this point merely not be against the manifest weight of the evidence. Habeas pet. at 11–12. Respondent counters that the waiver question is one of fact, and that the trial court was better positioned to evaluate the voluntariness of the waiver. The trial court settled on this standard of review based on two Illinois *Miranda* precedents, *People v. Bernasco,* 138 Ill.2d 349, 150 Ill.Dec. 155, 562 N.E.2d 958 (1990) and *People v. Scott,* 148 Ill.2d 479, 171 Ill.Dec. 365, 594 N.E.2d 217 (1992). However, the Supreme Court has held that *Miranda* rights are not themselves constitutional rights, but prophylactic measures intended to protect constitutional rights. *New York v. Quarles,* 467 U.S. 649, 657–58, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). In identifying the proper standard of review, it is thus more appropriate to turn to cases governing the waiver of other fundamental constitutional rights.

In *Miller v. Fenton,* 474 U.S. 104, 115, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985), the Court declined to abandon its settled rule of "nearly a half century of unwavering precedent" that the question of whether a confession is voluntary "merits treatment as a legal inquiry requiring plenary federal review." "What happened" issues warrant a presumption of correctness, but "the ultimate question" is not due deference because of its "uniquely legal dimension." *Miller,* 474 U.S. at 116, 106 S.Ct. 445.

Subsequently, in *Thompson v. Keohane,* 516 U.S. 99, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995), the Court held that the presumption of correctness under § 2254(d) did not encompass determinations as to whether a defendant was in custody, because that was a "mixed question[ ] of law and fact warranting independent review by the federal habeas court." *Thompson,* 516 U.S. at 106, 116 S.Ct. 457. Citing *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), the decision that was codified in § 2254(d), the *Thompson* Court reaffirmed that " 'basic, primary, or historical facts' are the 'factual issue[s]' to which the statutory presumption of correctness dominantly relates." *Thompson,* 516 U.S. at 110, 116 S.Ct. 457. The Court held that an ultimate determination calling for application of the controlling legal standard to historical facts "presents a 'mixed question of law and fact' qualifying for independent review." *Thompson,* 516 U.S. at 112–13, 116 S.Ct. 457.

The 1996 amendments to § 2554(d)(1) "place[d] a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). However, these amendments did not alter the rule that the presumption of correctness applies to facts, not to mixed questions of law and fact, and *Thompson* remains good law. This court finds that the question of whether Ward voluntarily waived his right to testify is a mixed question of law and fact, and as such warrants *de novo* review. Accordingly, this court agrees with Ward that the Appellate Court applied the wrong standard when it reviewed the trial court's ruling based upon a "manifest weight of the evidence" standard.

## IV. WAIVER OF RIGHT TO TESTIFY

As to the question of whether Ward personally waived the right to testify, initially his counsel told the court that it was the attorney's decision. *Ward,* slip op. at 14–15. Counsel expressed doubt that his client could participate meaningfully in a dialogue about waiver, let alone make the decision personally. *Ward,* slip op. at 14–15. Nonetheless, at the direction of the court, he attempted to discuss the matter with Ward. Immediately after trial, Ward asked his counsel why he had not had a chance to talk (habeas pet. at 6), leading counsel to conclude that Ward had indeed not personally decided against testifying and to file a post-trial motion to that effect with the court. At most, Ward's counsel accepted for one day the validity of the waiver: from August 21, 1996, when he attempted a discussion on the subject with Ward, until August 22, 1996, when Ward asked him why he had not been allowed to speak.

In finding a valid waiver, the Appellate Court noted that Ward "was somewhat impaired in his ability to understand the proceedings and to participate in his defense." *Ward,* slip op. at 18. The court acknowledged that "[t]he record makes it clear that this defendant had little understanding of the strategic implications of his decision," but found that he understood "that his attorney was acting on his behalf and in his best interests." *Ward,* slip op. at 22. However, as Justice Marshall wrote, a presumption that a defendant's counsel will always inform him of the relevant factors in a waiver of constitutional rights "amounts to a rule that all waivers made after the defendant has retained counsel *necessarily* will be considered voluntary, knowing, and intelligent. Such a rule offends common sense and impermissibly strips a defendant of constitutional protections long recognized by this Court."

*Robertson v. California,* 493 U.S. 879, 881, 110 S.Ct. 216, 107 L.Ed.2d 169 (1989) (Marshall, J., dissenting from denial of certiorari). This court concludes that Ward did not personally decide not to testify.

Whether the waiver was knowing, intelligent and unequivocal is intertwined with the "closely balanced" question of Ward's sanity. Ward was considered fit to stand trial, which necessarily implies that he was able to cooperate with his counsel in his defense. However, when it comes to the waiver of fundamental rights that must be waived personally by the accused, mere ability to cooperate with counsel does not suffice. It is appropriate for counsel to recommend waiver of the right to testify, and the accused may effectively waive by sitting silently while counsel rests without calling him to the stand. But such a waiver is effective only if the totality of the circumstances demonstrates clearly that the accused understood and concurred with the decision.

The Seventh Circuit has addressed the voluntariness of waiver of the right to testify on several occasions. In *Lee v. Murphy,* 41 F.3d 311 (7th Cir.1994), the district court considered the matter *de novo* as a question of law. The defendant argued that counsel had "ordered" him not to testify. The Seventh Circuit cited "a presumption against waiver," but said it was overcome in this case by "overwhelming evidence" that counsel conferred with the defendant and that the defendant acknowledged the waiver in open court. *Lee,* 41 F.3d at 315. Although Ward also conferred with counsel and acknowledged the waiver, after a fashion, on the record, the facts of this case are readily distinguishable from *Lee.* On the record of *Lee,* there is no indication that counsel or the trial court doubted the defendant's comprehension of the right he was waiving. In *Lee,* the defense counsel explicitly stat-

ed, "it's my advice to him that he not do so and he has decided to follow that advice totally of his own free will and knowing exactly what he is doing, particularly with the Court instructing him just prior to this that he has the right to testify." *Lee,* 41 F.3d at 314. The defendant affirmed that, answering "Yes" to the direct question, "Is that right, Antonio?" By contrast, counsel in *Ward* questioned Ward's ability to discuss the waiver (*Ward,* slip op. at 14–15), and the court accepted an ambiguous "I guess. I don't know" as sufficient. Further, the record here amply demonstrates Ward's utter inability to comprehend and respond intelligibly to simple questions, and describes the organic source of these deficiencies.

In *Underwood v. Clark,* 939 F.2d 473 (7th Cir.1991), the defendant similarly argued that his lawyer forbade him to testify. *Underwood,* 939 F.2d at 474–75. Citing the "grave practical difficulty in establishing a mechanism that will protect a criminal defendant's personal right . . . to testify in his own behalf without rendering the criminal process unworkable" (*Underwood,* 939 F.2d at 475), the Seventh Circuit held that "in a subsequent collateral attack on the conviction the defendant must produce something more than a bare, unsubstantiated, thoroughly self-serving, and none too plausible statement that his lawyer (in violation of professional standards) forbade him to take the stand." *Underwood,* 939 F.2d at 476. Again, this case presents a very different picture. Ward is not claiming that he was forbidden to testify. His claim in this habeas petition is that he did not unequivocally, knowingly and intelligently waive his right; and the record is rife with evidence to support his claim, particularly in view of the Appellate Court's assessment of the closely balanced question of his sanity.

Likewise, in *Manjarrez,* the defendant contended that the record showed that he did not "knowingly and intelligently" waive his right to testify on his own behalf. *Manjarrez,* 258 F.3d at 624. The district court "posed a series of clear and straightforward questions through an interpreter, informing Manjarrez of his right to testify and of the consequences of waiving it, and repeatedly asked Manjarrez if he understood what the court was saying and whether he wished to waive his right." Manjarrez repeatedly indicated that he did understand and that he did wish to waive his right. *Manjarrez,* 258 F.3d at 624. The Court stated, "[t]his is not a case wherein we have to infer a defendant's waiver from his mere silence (i.e., from his mere failure to take the stand and to object when his counsel rested without calling him as a witness). Rather, we have unambiguous affirmative indications of waiver from Manjarrez's own lips." *Manjarrez,* 258 F.3d at 624. The Court noted that "[w]hile there may be cases wherein a defendant's conduct clearly indicates a fundamental lack of understanding regarding the meaning of the right to testify and/or the consequences of waiving it, this is not such a case." *Manjarrez,* 258 F.3d at 624. The Court declined to require further proceedings "on the basis of an unsubstantiated, post hoc claim that [the defendant] did not understand his right to testify when he waived it, . . . especially when the claim is belied by the record." *Manjarrez,* 258 F.3d at 624.

 In this case, by contrast, there was no "clear and straightforward" effort by the court to ascertain that Ward understood the nature and implications of the right he was waiving. There was no "unambiguous affirmative indication[ ] of waiver from [the defendant's] own lips," but rather a decidedly unclear and ambiguous "I guess. I don't know." And the

claim of failure to understand is far from "belied by the record."

The Appellate Court considered that if "mere silent acquiescence" to counsel's recommendation that the defendant not testify is sufficient to support an implied waiver, then "surely an express statement by a defendant that he accepts his attorney's advice must support an express waiver." *Ward*, slip op. at 22. This court concurs that an express statement of agreement with an attorney's advice would support an express waiver, but questions the characterization of Ward's response to the judge's questioning as "an express agreement" with the attorney's advice. Asked whether he so agreed, Ward responded, "I guess. I don't know." Even taking these words at face value, they are at best equivocal. The Appellate Court, in citing them, dropped the "I don't know" that constituted Ward's final word, and focused on the "I guess." *Ward*, slip op. at 22. Even that phrase is less than persuasive evidence of Ward's decision. However, the record is replete with evidence that one cannot take Ward's responses to questions at face value. His individual answers to questions posed to him by physicians, his attorney, or the court may have the semblance of coherence and validity, in the sense that they are possible answers to the questions asked. But taken together, they make no sense. Thus, the individual answers, contrary to appearances, cannot be deemed to be meaningful and reliable. This, of course, holds as true for the straightforward "Yes" response to the query "Did you want to tell your story?" as for the "I guess. I don't know." The trial court seemed to acknowledge this by indicating "That's the best we will ever do."

■ Finally, when a defendant purports to waive a fundamental constitutional right, "it is the State that has the burden of establishing a valid waiver." *Michigan v. Jackson*, 475 U.S. 625, 633, 106 S.Ct.

1404, 89 L.Ed.2d 631 (1986). The State did not meet that burden in this case. Based upon the record, this court concludes that the acceptance of Ward's waiver as knowing, intelligent and unequivocal was error. This court therefore concludes that the Appellate Court's decision that Ward validly waived his right to testify was an "unreasonable application of clearly established federal law as determined by the Supreme Court of the United States."

## V. HARMLESS–ERROR ANALYSIS

Not all constitutional error fatally infects a trial. *See Arizona v. Fulminante*, 499 U.S. 279, 307, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (constitutional "trial error" is amenable to harmless-error analysis). Harmless error analysis must be undertaken to determine whether the verdict may be allowed to stand despite constitutional error. The Seventh Circuit has held that deprivation of the right to testify is subject to harmless-error analysis. *Ortega v. O'Leary*, 843 F.2d 258, 262 (7th Cir. 1988). Ward urges that if a harmless-error analysis is undertaken, the appropriate standard is whether the error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The State does not address the question of harmless error, but could argue that under *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), on habeas review federal courts should apply the substantial and injurious effect standard from *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), rather than the *Chapman* standard. *But see Ortega*, 843 F.2d at 262; *United States v. Saadeh*, 1997 WL 391974, *5 (N.D.Ill.1997).

■ Because the only issue at trial was whether Ward was legally responsible for his actions, the question is whether the

deprivation of his right to testify prejudiced him with respect to the jury's assessment of his sanity. The fact that Ward was his wife's killer was undisputed; therefore, whichever harmless error standard is used, it must be applied to the State's case for Ward's sanity.

The Appellate Court called the question of Ward's sanity "closely balanced," and indicated that if it had not been for his intoxication, the jury's decision might well have been rejected as against the manifest weight of the evidence (*Ward*, slip op. at 13), as was done in *Janecek*, 133 Ill.Dec. 273, 540 N.E.2d at 1143. Had he testified, the jury would have seen Ward in a sober condition. Judging from the record, Ward appears to have been incapable of responding to any question in a way that demonstrated that he understood what was being asked. As the record shows, his answers to "Yes" or "No" questions bore no relationship to the questions asked. Habeas pet. at 4–5. In his interactions with his defense counsel, he answered "uh huh" no matter what he was asked. *Ward*, slip op. at 14–15. And at both his meeting in chambers with the judge and his post-trial hearing, the record shows rambling, incoherent speech. It is possible that the jury would have concluded from seeing him on the stand that the expert psychiatric witnesses were correct in their assessment that Ward was legally insane at the time of the killing, and that Dr. Traugott correctly surmised that the brain injury, without alcohol, would have sufficed to render him incapable of conforming his actions to the law. Furthermore, Ward's testimony, even if incoherent, could have shown that he had no memory of killing his wife. Habeas pet. at 18–19.

Applying the *Chapman* standard, it is not clear beyond a reasonable doubt that the deprivation of Ward's right to testify did not affect the jury's judgment on the "closely balanced" question of his sanity.

By the *Kotteakos* standard, a conviction cannot stand "if one cannot say, with fair assurance, after pondering all that happened ..., that the judgment was not substantially swayed by the error." *Kotteakos*, 328 U.S. at 765, 66 S.Ct. 1239. *Kotteakos* itself excepted constitutional errors. *Kotteakos*, 328 U.S. at 764–65, 66 S.Ct. 1239. However, the Court in *Brecht* held that the *Kotteakos* harmless-error standard applies in determining whether habeas relief must be granted because of constitutional error of the trial type. *Brecht*, 507 U.S. at 638, 113 S.Ct. 1710. The standard is defined as whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623, 113 S.Ct. 1710. Ward's case is perhaps less amenable to this analysis than many, because the effect of the error must be inferred from the absence of an impression the jury could have gleaned from seeing and hearing him on the stand. Nonetheless, this court concludes that the inability of the jury to see and hear Ward's testimony had a substantial and injurious effect on the probable outcome of the sanity determination.

### CONCLUSION

For all of the reasons stated, this court concludes that the Appellate Court's decision was an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. Accordingly, Ward is entitled to relief under 28 U.S.C. § 2254.

IT IS THEREFORE ORDERED THAT:

(1) Ward's Petition under 28 U.S.C. § 2254 for a writ of habeas corpus (# 6) is GRANTED.

(2) This court vacates Ward's conviction. The State shall have 120 days from the issuance of this order to release or retry

Ward. On the court's own motion, execution of this order is stayed pending appeal.